David Mincin, Esq.
State Bar No. 5427
MINCIN LAW, PLLC
7465 W. Lake Mead Boulevard, Suite 100
Las Vegas, NV 89128
PH: (702) 852-1957
dmincin@mincinlaw.com

Adam Allen, Esq.
ALLEN & ASSOCIATES
2777 Allen Parkway, Suite 1000
Houston, Texas 77019
Phone: 832-871-5920
Fax: 281-503-7671
adam@aallenlaw.com
*Pro Hac Vice*

*Attorneys for plaintiff Gaia Ethnobotanical, LLC*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| GAIA ETHNOBOTANICAL, LLC<br><br>Plaintiff,<br><br>v.<br><br>T1 PAYMENTS LLC<br><br>Defendant. | Case No. 2:22-cv-01046-CDS-NJK<br><br>**GAIA ETHNOBOTANICAL, LLC'S THIRDAMENDED PETITION AND APPLICATION FOR INJUNCTIVE RELIEF FILED SUBJECT TO T1 PAYMENT, LLC'S BANKRUPTCY STAY** |

**PLAINTIFF'S THIRD AMENDED COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF FILED SUBJECT TO T1 PAYMENTS, LLC's BANKRUPTY STAY**

Plaintiff, Gaia Ethnobotanical, LLC, a limited liability company organized under the laws of the State of Nevada, doing business as Mitragaia (hereinafter referred to as "Gaia") by and through its attorneys, files its Third Amended Complaint against Defendant T1 Payments, LLC. Plaintiff asserts causes of action for Fraud, Fraud by Nondisclosure, Fraud by Omission, Civil Conspiracy to Defraud, Conversion, Theft, Money Had and Received, Breach of Contract, Breach of Implied Covenant of Goof Faith and Fair Dealing, Unjust Enrichment, , violations of the Nevada Civil RICO Statute, violation of the Nevada Deceptive Trade Practices Act, and seek a Declaratory Judgment concerning the rights and duties of the parties. Plaintiff further applies for injunctive relief and requests the Appointment of a Receiver.

Plaintiff fully intends to pursue its claims to completion at trial.

## **I. INTRODUCTION**

1. T1 Payments, LLC, (hereinafter "T1"), Donald Kasdon, Amber Fairchild and Debra King were the ring leaders that defrauded $353,413.87 from Gaia in a fraudulent online scheme. Kasdon posed as the principal and agent of a real credit card payment facilitator, but actually used an illegal, unauthorized, and convoluted international conspiracy that only made his company, T1 Payments, LLC, *appear* to be a real processor. Kasdon, as T1's's agent, sold these illegal and unauthorized services to at least five hundred other merchants before he and T1 identified Gaia as their next victim. Fairchild, Kasdon's fiancé, and King, his mother, acted as conspirators and strawmen for Kasdon and T1, allowing them to use their identities in the formation of a network of shell companies, formed after T1, that supported their fraud. The full scheme, begun in 2012, will be laid out in more detail in the Facts Section *infra*.

2. T1's actions against Gaia commenced in July 2019, when its agent and alter ego Kasdon directed Shawn Sullvan to cold call Gaia as their "broker" to sell credit card services to Gaia, that would purportedly be provided by T1 Payments, LLC. After Gaia indicated its interest in those

services, a meeting was arranged between T1 and Gaia's manager, Dan Bower, in Miami, Florida. After flying to Miam for the meeting, T1's agent Kasdon told Bower that T1 Payments, LLC was a real credit card payment processor with direct relationships with Visa and Mastercard ("Card Brands") and Acquiring Banks, and that T1 Payments, LLC would process electronic sales Gaia legitimately, pursuant to the Payment Brand Rules[1], program rules and policies of its third party processors, and all applicable laws and regulations.

3. Based on that meeting, a second meeting took place at the Wynn Hotel in Las Vegas, where T1's agent Kasdon made an unusual demand. He instructed Gaia to form a new company in the UK, with a name similar to Mitragaia, to "insure Gaia's longevity." After Gaia agreed to the new entity, T1 Payments, LLC, at Kasdon's direction, formed the new company "Mitragaia, LTD" in Ireland.

4. Thereafter, On August 12, 2020, the Plaintiff entered into an Agreement with T1 Payments, LLC that turned out to include many fraudulent promises. A true and correct copy of this Agreement and its supplemental documents is attached as Exhibit 1.

5. Astonishingly, and unknown to Gaia at the time, *T1 Payments, LLC and its agent, Donald Kasdon had both been banned from processing credit card transactions since 2017*. That year, Kasdon was MATCH Listed[2], and T1 Payments, LLC's "Payment Facilitator" license was revoked, leaving it unable to handle merchant funds. As it turned out, instead of being in business with T1 Payments, LLC, Gaia was unwittingly doing business through an entire network of shell companies controlled by T1's agent, Kasdon, and Payvision, a Dutch bank that was not legally allowed to service merchants from the U.S.

6. T1's agent, Kasdon, used his fake and defunct payment processing company T1 Payments, LLC to induce Gaia into a contract that allowed T1 Payments to control, and ultimately to abscond

---

**1** The requirements from Visa, MasterCard, Discover, and American Express that all handlers of merchant funds and merchant credit card transactions must follow in order to be allowed to participate in credit card processing.
**2** The MATCH List is a list of people whose rights to transact credit card business has been terminated.

with, Gaia's funds. Since 2012 T1 used Fairchild and King to create a web of his alter-ego and/or conspiring shell companies including: (i) T1 Payments, LTD; (ii) TGlobal Services, LLC; (iii) TGlobal Services, LTD (UK); and (iv) TGlobal Service Limited (Isle of Man)[3], (all together referred to as "T-Companies").[4] By the time T1 met Gaia, its scheme also included the assistance and agreement of the following conspiring companies: (i) the Dutch company Payvision, B.V. (including its CEO Rudolf Booker); (ii) Payvision Risk, Inc., and; (iii) Actum Processing, LLC.

7. T1 used these entities to deceive Gaia (and its new foreign entity subsidiary Mitragaia, LTD) into entering the payment card processing relationship whereby T1 Payments, LLC falsely promised it would legitimately process credit card and debit card transactions for Gaia's on-line business. Instead, since 2012, T1 had been using merchant money at its whim, periodically taking a merchant's entire reserve account under its control and transferring it to Kasdon and its other conspirators King and Fairchild, usually once it was worth over a million dollars.

8. On December 16, 2020, three months after Gaia signed up and had grown a substantial merchant reserve account with T1 Payments, T1's agent, Kasdon received a notice from Payvision that it was terminating T1's ability to run its illegal scheme on or after March 16, 2021 due to sloppy, illegal and fraudulent activities that were no longer hidden and that would likely affect Payvision. To make the conspiracy clearer, the letter from Payvision was addressed to TGlobal Services, LTD, a UK company that was actually in contract with the Dutch bank whereby credit card payment for the Plaintiff were processed overseas. Instead of notifying Gaia that it should seek a new processing company, T1 kept that information hidden from Gaia and induced Gaia to continue to accrue more funds in its merchant reserve account for five additional months until T1 controlled Three Hundred Fifty-Three Thousand, Four Hundred Thirteen Dollars & Sixty-Seven Cents ($353,413.67) of Gaia's

[3] The T1 Payments brand had mirroring companies in the U.S., UK, and Isle of Man for ease of moving funds.

[4] T1's agent, Kasdon could not be on any corporate charters because he was in hiding from a judgment creditor since 2009.

customer's funds. Had T1 notified Gaia of the pending termination, it is likely the scheme would have remained hidden forever.

9. On May 28, 2021, when Payvision eventually followed through with its termination of T1's scheme, T1 stole those funds from Gaia, along with approximately $11,899.894.40 belonging to hundreds of other merchants who T1 had also duped.

10. Importantly, there was never a time between January 2017 and May 28, 2021, that T1 Payments, LLC had a contract with any acquiring bank or with any credit card company to process the transactions for Gaia's customers. That was always a lie, both before and *after* the contract in this case was signed, because that same fraudulent statement was also contained *within the contract* at the introduction, and at §4.1. T1 Payments secretly relied on Actum Processing LLC and Payvision, to process the transactions T1 promised it would handle. T1 also relied on T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, Limited (Isle of Man), and TGlobal Services, LTD (UK-1) and TGlobal Services LTD (UK-2) (all together the "T Companies") to hold and transfer the Plaintiff's funds. Neither T1, nor Kasdon, Fairchild, King, nor any of the T-Companies had any ability to process credit card payments while T1 claimed to service the Plaintiff Gaia.

11. Further, at the time Gaia was entering into the credit card services contract with T1 Payments, LLC (on August 12, 2020), T1 was apparently *already* planning to send all the money it had absconded from merchants since 2012 oversease to one of the other T-Companies. To that end, T1's agent Kasdon directedFairchild, Pereira, Kamaly, and Dawson[5] to form and run a new brand of payment processing companies with mirroring entities in the U.S. and UK called "Pixxles," which all agreed to help him do.

---

[5] Scott Dawson, a UK citizen, was one of T1 Payments LLC's most trusted employees, having his own American Express card through King's account named "T1 Payments, LLC" which he used to help set up Pixxles, LTD in the U.K.

12. Beginning in 2017, after it was MATCH listed for theft of merchant funds and T1 Payments, LLC became defunct, T1 used King, Fairchild, Pereira, Kamaly, and Dawson's identities to form and operate a new set of shell companies including: (i) Pixxles, LLC; (ii) Pixxles, LTD; (iii) PXLS, LLC; and (iv) Pixxles Global, LTD (n/n/a Premium Services Global, LTD), (all together referred to as the "Pixxles Companies"). King, Fairchild, Pereira, Kamaly, and Dawson signed the formation documents and/or annual reports in the UK, or the Isle of Man, for the company or companies they were operating for T1.

13. After T1 was notified by Payvision that T1's scheme would no longer be supported by the bank on December 16, 2020, those Pixxles companies began reporting large influxes of capital. Since T1 had apparently already planned for his U.S. business to end, it immediately directed King to begin to withdraw and wire transfer large amounts of money out of it and the T-Companies, , ultimately for transmitting to the Pixxles venture in the UK and personal funds such as the Deep Pockets Trust and its holder, Deep Pockets, LLC.

14. At all times complained of, King's only responsibility for the above companies she "directed" (T1 Payments, LTD, TGlobal Service, LTD (UK-1), TGlobal Service, LTD (UK-2), TGlobal Services Limited (Isle of Man), T1 Payments, LLC, and TGlobal Services, LLC), is to do what T1's agent, Kasdon directed her to do.

15. Likewise, Fairchild's only responsibility for the above companies she "directed" (Pixxles LLC, PXLS, LLC, Pixxles, LTD) was to do what T1 directed her to do.

16. Further, Dawson, Kamaly and Pereira's only responsibilities for T1 were to place their names on the rolls of Pixxles, LTD and do what T1's agent, Kasdon directed them to do.

17. Gaia now understands that T1 directed its employee, Elisabeth Ravelo, to create a United Kingdom company for the Plaintiff called "Mitragaia, LTD" because T1's scheme required the use of the Dutch bank to process credit card payments, and it was only supposed to operate in the

European Economic Area. Neither T1,nor its agents or conspirators, told the Plaintiff about the foreign bank.

18. According to bank records produced in T1 Payments, LLC's bankruptcy on November 20, 2023, the T1 scheme required it to use all of its shell companies to handle parts of each transaction that Gaia's customers initiated. That includes each of the T Companies. The T-Companies held and transferred between themselves Gaia's funds, as those funds traveled to, and from, Payvision, B.V., and Actum Processing, LCC, before being distributed to one of T1's shell companies, minus all the fees along the way. The scheme will be explained in more detail hereinbelow.

## II. PARTIES

19. Plaintiff, Gaia Ethnobotanical, LLC (referred to interchangeably herein as "Gaia" or "Plaintiff"), is, and at all times relevant herein has been, a Nevada limited liability company organized under the laws of Nevada, which does business as "Mitragaia," and maintains its principal place of business in Henderson, Nevada.

20. Defendant, T1 Payments, LLC ("T1 Payments"), is a limited liability company organized under the laws of the State of Nevada with its principal place of business in Las Vegas, Nevada. T1 Payments, LLC can be served by serving its registered agent Northwest Registered Agent, LLC at 401 Ryland Street, Suite 200-A, Reno, Nevada 89502.

## III. JURISDICTION AND VENUE

21. Jurisdiction and venue are proper in this Court pursuant to the parties' Card Payment Processing Agreement described below, which states that the federal or state courts of Clark County, Nevada are the exclusive venue for disputes arising thereunder. Moreover, both the Plaintiff and Defendant are or were residents of, or primarily operate in, Nevada at the time of the filing of this lawsuit.

## IV. EXHIBITS

22. The Plaintiff' claims rely upon the following contracts and documents that have already been filed in this case with the Second Amended Complaint:

| | |
|---|---|
| Exhibit 1: | Merchant Terms Acknowledgment and Payment Processing Agreement |
| Exhibit 2: | ISO - M Designation for T1 Payments, LLC |
| Exhibit 3: | LinkedIn Page of T1 Payments, LLC Introduction Statement |
| Exhibit 4: | Payvision Contract with TGlobal Services Limited |
| Exhibit 5: | LinkedIn Page of T1 Payments, LLC Advertising for High-Risk Clients |
| Exhibit 6: | Certificate of Formation for Mitragaia Limited |
| Exhibit 7: | Affidavit of Scott Wellman |
| Exhibit 8: | T1 Payments May 28, 2021 Email to All Merchants |
| Exhibit 9: | Statement of Capital for Pixxles, Ltd. File Dated March 31, 2021 |
| Exhibit 10: | Statement of Capital for Pixxles, Ltd. File Dated June 4, 2021 |
| Exhibit 11: | Resolution of Pixxles, Ltd. File Dated June 16, 2021 |
| Exhibit 12: | Pixxles Ltd Allotment of Shares Dated March 29, 2022 |
| Exhibit 13: | T1 Payments Website |
| Exhibit 14: | Deposition Testimony of Donald Kasdon September 22, 2021 |
| Exhibit 15: | Deposition Testimony of Amber Fairchild September 9, 2021 |
| Exhibit 16: | Deposition Testimony of Debra King September 9, 2021 |
| Exhibit 17: | Deposition Testimony of Joe Emig |
| Exhibit 18: | Deposition testimony of Maria Terpstra |
| Exhibit 19: | 2022 Arbitration Agreement between TGlobal LTD and Payvision |
| Exhibit 20: | *Vantiv v. T1 Payments, LLC* 1:17-cv-00164-SJD in the USDC Southern Ohio |

Exhibit 21: December 16, 2020 Letter to Kasdon from Payvision

Exhibit 22: December 18, 2020 Letter to Kasdon from Payvision

Exhibit 23: Chase Bank Statements for TGlobal Services, LLC

Exhibit 24: Wells Fargo Bank Statements for T1 Payments, LLC

Exhibit 25: Deep Pockets Trust Land Use Application

Exhibit 26: Deep Pockets, LLC loan from T1 Payments, LLC in May 2021.

Exhibit 27: American Express Statements for Kasdon, King, Fairchild, & Dawson, Kaye, & Strachan

The following exhibits are being filed for the first time with the Third Amended Complaint:

Exhibit 28: Deposition of Donald Kasdon April 9, 2025

Exhibit 29: Deposition of Donald Kasdon May 19, 2025

Exhibit 30: Deposition of Amber Fairchild April 29, 2025

## <u>VI.</u> <u>FACTS</u>

23. The Plaintiff is an online marketers of all natural supplement products derived from or containing "mitragyna speciosa," (hereinafter referred to as "kratom"). Kratom is a type of tree leaf from Southeast Asia that is closely related to coffee plants. The Plaintiff are one of the largest online retailers for kratom in the U.S.

24. As e-commerce merchants, Gaia sell its goods to customers primarily via orders over the internet so, accordingly, accepting customer payments by credit or debit cards is an essential part of their business model. T1 Payments, LLC fraudulently induced Gaia to into entering a purported payment card processing relationship with T1 Payments, LLC wherein T1 Payments, LLC falsely claimed it was a Payment Facilitator ("PayFac") and that it would process transactions pursuant to the Card rules, policies of acquiring banks, and all laws. T1 Payments, LLC also promised the Plaintiff that it could and would act as Plaintiff's electronic payment processor for their online sales of kratom products to their customers. Specifically, T1 represented during two meetings with Gaia

that T1 Payments, LLC was a payment processing company and that had direct business relationships with the payment card brands such as Visa USA, Inc. ("Visa"), Mastercard International, Inc. ("MasterCard"), Discover Financial Services, LLC ("Discover"), American Express and/or other networks (collectively the "Payment Brands") and select merchant acquiring banks ("Acquirers") to process such electronic transactions for kratom products.

25. However, in reality, T1 Payments, LLC was not a payment processor but rather acted solely as the name and logo on the contract, having no bank account after January 2021, and having no relationship with any of the Payment Brands and/or Acquirers that were willing or authorized to process electronic transactions for kratom products. In actuality, T1along with Debra King, and Amber Fairchild, utilized a web of shell companies as mere conduits to defraud and then steal funds from numerous merchants (including the Plaintiff) by collecting, aggregating, and then submitting transactions for products that were specifically prohibited by its Acquirer relationship with Payvision and were in violation of Payment Brands and federal law.

*T1's Company History*

26. T1 Payments, LLC was a VISA and Mastercard-registered Payment Facilitator ("PayFac") until 2017 in the U.S. A PayFac is a service provider that enables merchants to process credit card transactions with the help of an Acquiring Bank who has a relationship with the major credit card brands. As a PayFac, T1 Payments, LLC operated under a contract with WorldPay (then d/b/a Vantiv), a major payment processor with more than 20 billion transactions per year at the time. In March of 2017, after it discovered T1 Payments, LLC was creating fake merchant accounts and using other merchants' credit card transactions as its own, Vantiv filed a fraud complaint in the U.S. against T1 Payments, LLC. The latter subsequently chose to process its U.S. customers through a Dutch acquiring bank, Payvision B.V., up until May 28, 2021. However, Payvision was not authorized to

operate in the U.S. But because T1's manager was friends with the CEO of Payvision, they decided to hide their illegal operation through front companies.

*The Vantiv Fraud Complaint*

27. Several years earlier, and only for a ten-month period (March 31, 2016, to January 25, 2017) T1 Payments, LLC was a Payment Facilitator ("PayFac") pursuant to a contract with a major payment processor called "Vantiv."[6] As a PayFac, pursuant to the agreement between T1 Payments, LLC and Vantiv (the "T1/Vantiv Agreement"), T1 Payments, LLC was authorized to sign-up merchants, take their transactions, and then submit them to Vantiv for processing. T1 Payments, LLC was also required to perform underwriting for the sub-merchants it referred to Vantiv to ensure they were legitimate businesses with acceptable profile risks, and to cover any losses associated with a chargeback resulting from a sub-merchant's transactions[7].

28. In or around September 2016, Vantiv notified T1 Payments, LLC that the transactions its sub-merchants processed through Vantiv were experiencing a rate of chargebacks that exceeded the Payment Brands' maximum thresholds established by the Card Rules, mostly associated with fraud. Based on such a high rate of chargebacks, Vantiv notified T1 Payments, LLC that it could no longer sign up new sub-merchants nor submit transactions for high-risk sub-merchants (i.e., merchants that for any reason present a higher risk of fraud to the credit card processor based on business activity).

29. Two months later, in November 2016, due to T1 Payments, LLC continuing to board high-risk merchants, and continuing to exceed the chargeback rate thresholds considered acceptable by the Payments Brands under the Rules, Vantiv notified T1 Payments, LLC of its intent to terminate the T1/Vantiv Agreement as of February 1, 2017.

---

[6] Vantiv was the largest U.S. merchant acquirer handling more than 20 billion transactions a year until it became part of Fidelity in 2019.

[7] A chargeback is a forced transaction initiated by a cardholder or a cardholder's bank often related to fraud.

30. However, a week before the original deadline, on January 25, 2017, Vantiv was forced to terminate T1 Payments on the spot. Vantiv discovered that T1 Payments, LLC was using stolen credit card numbers to process fraudulent transactions for fictitious sub-merchants, the proceeds of which were deposited directly into T1 Payments' bank accounts, which it immediately cashed-out and closed, absconding with the illicitly obtained funds before Vantiv could discover the fraud. Vantiv also learned T1 Payments, LLC was the source of many of the chargebacks. Upon learning of the fraud, Vantiv promptly terminated the agreement with T1 Payments, thereby ending T1 Payments' role as a PayFac, and causing its de-registration with the Payment Brands.

31. On or about March 14, 2017, Vantiv sued T1 Payments, LLC in the United States District Court for the Southern District of Ohio for breach of contract and fraud. S*ee* 1:17-cv-00164-SJD, *Vantiv v. T1 Payments, LLC*, in the USDC for the Southern District of Ohio. Vantiv alleged therein that, not only did T1 Payments breach its contract with Vantiv, but it also made-up fictitious entities to defraud Vantiv, and stole money from merchants by employing a scheme to divert funds to T1 Payments, LLC's bank account that should have been settled directly to merchants. Vantiv further alleged that T1 Payments, LLC set up fake merchants by using its own bank account as the supposed bank account of the fake merchant, and then used stolen credit card numbers to submit hundreds of fraudulent transactions to fund its own account from the accounts of the cardholders whose Payment Card numbers were stolen.

32. In May 2018, T1 Payments, LLC settled with Vantiv.

33. However, because of *Vantiv*, the credit card networks revoked T1 Payments, LLC’s registration as a Payment Facilitator. Around that same time, the company’s founder and CEO, T1’s agent, Donald Kasdon, was put on the MATCH list, an industry blacklist for the card payments sector for people who cannot operate in the industry.

34. After January 25, 2017, neither T1 Payments LLC, nor any of its alter ego T-Companies were authorized to handle merchant money or to access merchant financial accounts. Even as an "ISO-M," T1 Payments LLC was only allowed to perform ISO-M Program Services on behalf of its sponsoring acquirer (Vantiv) with respect to Visa transactions until January 25, 2017. Furthermore, given T1 Payments, LLC's total lack of registration with the Payment Brands as a "Program Service PayFac" during all times complained of the Card Rules prohibited "T1 Payments LLC" from performing PayFac Program Services. Among other things, that means that T1 Payments, LLC was prohibited under the Rules from contracting directly with merchants, without the Acquirer as a party to the merchant agreement, and from receiving settlement funds from an Acquirer on behalf of a sponsored merchant (i.e., a merchant that contracts directly with a PayFac often referred to as a sub-merchant) or any other merchant.

*The Payvision Plan*

35. After T1 Payments, LLC could no longer operate in the U.S. due to ongoing fraudulent activities, T1's agent, Kasdon applied to Payvision for support. However, since Payvision was not legally authorized to provide acquiring services in the U.S., T1's agent, Kasdon and his family (King and Fairchild) had to establish companies in European Economic Area ("EEA") to circumvent these regulatory obstacles. Only after T1 directed King and Fairchild to set up companies in the EEA did Payvision sign a Merchant Agreement with TGlobal Services, LTD (several months before that company was actually formed). On December 13, 2016, - T1 Payments secured credit card processing services through a new contract between Payvision and T1's conspiring company: "TGlobal Services LTD (Isle of Man)" Using TGlobal Services LTD (Isle of Man), T1 secured the services agreed to in a master-merchant agreement with Payvision through TGlobal Services, LTD (Isle of Man). But nothing in that Agreement would allow it to process cards for T1 under the Card Rules.

36. A more detailed summary of the EEA T-Companies set up by T1 through King and Fairchild, to process its US merchants via Payvision are as follows:

- On January 13, 2015, T1 applied for a partnership with Payvision, which Payvision CEO Rudolf Booker approved on 15 February 2015.
- On March 11, 2015, T1, through it's agent Donald Kasdon, established T1 Payments Limited in the UK, where his mother, Debra King, was registered as director and shareowner without any real duties for the company (no website, no employees, a WeWork office).
- On April 16, 2015, Payvision entered into a Merchant Agreement with T1 Payments, LTD.
- On July 8, 2015, after a lot of chargeback requests and fraud alerts, Payvision had to end its first trial of cooperation with T1 conspirator T1 Payments LTD.
- Payvision CEO Rudolf Booker personally advised T1's agent, Donald Kasdon to establish a shell company in the Isle of Man due to its preferable loose rules to continue the cooperation between Payvision and T1.
- On December 7, 2016, at T1's demand, Debra King, established TGlobal Services Limited in the Isle of Man.
- On December 13, 2016, a merchant agreement was entered into between TGlobal Services Limited (Isle of Man) and Payvision. The company was dissolved in 2020.
- In November 2017, Payvision signed a payment service provider contract with TGlobal Services LTD (UK-1) at T1's request – although TGlobal Services LTD had not yet been formed at that time and did not have a payment facilitator license with VISA or Mastercard.
- On April 10, 2018, "TGlobal Services LTD (UK-1)" was finally established in the UK, in England. At T1's request Debra King, and Amber Fairchild were installed as directors.

*Payvision facilitated the T1 Payments US Business*

37. In fact, however, it appears these EEA T-Companies in the Isle of Man and the UK were dormant from the beginning and, therefore, only "paper companies" with no activities except to be named in the agreements with Payvision, and then to have their name used in chain of custody of transactions for T1 and Payvision. These EEA entities were listed as so-called Master Merchants with Payvision.

38. Ultimately, T1 Payments, LLC's "customers" were processed as EEA sub-merchants using the fake EEA T-Companies listed above. Having lost its registration and ability to offer legitimate processing services in the U.S., T1 Payments, LLC was not in the contractual loop. T1 Payments, LTD (UK-1) bundled its merchant transactions into one account and then sent them to Payvision using master merchant accounts held in the name of TGlobal Services LTD (UK-1), without the T1 merchants' knowledge. Payvision processed them through Visa and Mastercard in the Netherlands in conspiracy with T1.

*Payvision Conspired with T1 and it's agent Kasdon to Commit the Fraud*

39. The "Payvision Payment Facilitator Agreement" with Payvision violated the rules promulgated by the major credit card companies regarding Payment Facilitators as well as U.S. federal law. This Agreement labeled TGlobal Services LTD (UK-1) as a "Master Merchant," and purported to allow that company to serve merchants such as Gaia. *See* the Payvision Agreement attached hereto as Exhibit 4; *and see* Section V(E) *infra*. Pursuant to the terms of the Payvision Agreement, Payvision agreed to settle all funds flowing from the agreement to TGlobal Services, LTD (UK-1).

40. Instead, Payvision was sending funds to its subsidiary Payvision Risk, Inc. (New York), which was sending funds to TGlobal Services, *LLC* in large, aggregated wire transfers. From there, T1 directed weekly large wire transfers of $2,500,000.00 from TGlobal Servcies, LLC (which it totally controlled) to Actum Processing, LLC for splitting into the various amounts owed to T1 Payments LLC's 500 merchants.

41. Had Plaintiff known their customers' transactions were being handled by a company that: (a) lost its license to operate as a payment facilitator in 2017; (b) was subject to termination by its acquiring bank at any time; and (c) that was controlled by a man who was MATCH listed and unable

to work in the credit card industry; and (d) that was operating in violation of federal law and the Card Brand Rules, Plaintiff never would have signed the contract with T1 Payments, LLC.

42. Although the fraud committed by T1, T Companies, T1's agent Kasdon, Fairchild, and King reached beyond Payvision, B.V., and its subsidiary Payvision Risk, Inc., Payvision facilitated, ratified, furthered, and materially participated in much of the theft, deception, and fraud through secret agreements with the T1, the T-Companies, Fairchild, and King, as well as the principal-agent relationship it formed between itself and TGlobal Services, LTD (UK-1). Because Payvision first entered into written agreements with TGlobal Services, LTD (Isle of Man) as a *merchant* in 2016, but then secretly amended that agreement to a new agreement with the title of a "Payment Facilitator Agreement" *but that still only referred to TGlobal Services, LTD (Uk-1) a "Master-Merchant" internally*, Payvision sought to surreptitiously allow T1 and its conspirator TGlobal Services, LTD (UK-1) to circumvent U.S. and Dutch laws (*See* Section V(E) *infra*) and re-sell processing services offered by Payvision in the Netherlands.

43. Furthermore, Payvision's CEO and T1 Payments knew that "TGlobal Services, LTD (UK-1)" was not a licensed Payment Facilitator during the time Gaia's transactions were flowing through that company (between August 12, 2020, and May 28, 2021) and that Payvision was knowingly allowing the defunct T1 Payments, LLC to masquerade as a payment processor to the Plaintiff.

44. Payvision and the T-Companies (except T1 Payments, LLC) then knowingly concealed themselves from Gaia so that they could rely on T1 Payments, LLC to continue misrepresenting that they had direct relationships with the banks and that they would handle the transactions. Payvision and the T Companies allowed T1 Payments, LLC to pose as a processor in its own name without revealing Payvision's name, or any of the other T Companies' names. These acts allowed Payvision and the T Companies to collect and then withhold money for bogus and undocumented fees,

including "termination fees" and "reserve fees" in an alleged agreement that no one disclosed to Gaia every day between August 12, 2020 and May 28, 2021.

45. Eventually, on May 28, 2021, Payvision terminated the ability of TGlobal Services, LTD (UK-1) to process payment card transactions for T1 through Payvision as a result of the unauthorized transactions T1 completed through its conspirator's bank account and its web of conspiring shell companies servicing the so-called "high-risk" merchants. At the same time, vast sums of money were being re-directed to bank accounts controlled by T1, Kasdon, King, and Fairchild in the US and the UK.

*T1's Pixxles Scheme*

46. As T1's sister T-Companies were being drained during the many lawsuits against T1 Payments, LLC, Kasdon acting in authority as agent of T1 directed Fairchild to set up a similar scheme in the U.S. and UK called "Pixxles." He also directed Scott Dawson, employee of T1 Payments, LLC, to direct Pixxles, LTD.

47. On December 7, 2017, Pixxles, LLC was formed in Nevada by Fairchild under orders from T1.

48. On October 4, 2018, the now FCA-regulated "Pixxles LTD" was established by Amber Fairchild in the UK under orders from T1.

49. On October 15, 2018, "PXLS, LLC" was formed in Nevada under orders from T1. It was formed to take over all of T1's merchants. T1 paid for the formation and the licensure of Pixxles, LTD, along with the expenses for all of Pixxles' managers and its offices.

50. On November 9, 2021, T1 directed the formation of "Pixxles Global LTD," a combination of the names "Pixxles" and "TGlobal." After the lawsuits against the T-Companies and the Pixxles companies began, T1's agent, Kasdon directed its manager to change its name to "Premium Service Global, LTD" in 2022.

*Transaction Summary*

51. The numbered flow chart below shows T1's convoluted business scheme, as it operated until May 28, 2021. T1 used this scheme without notifying the Plaintiff of the foreign transaction fees that would be levied by the Dutch processor, or the transaction fees that would be levied by Texas processor, or that the Plaintiff' customers' data and funds would be transacted in a foreign country or countries. Also, T1 never controlled anything except a logo on a website.

52. The Plaintiff was forced to wait to understand T1's scheme (mapped-out on the following page) because T1 concealed it's network of companies in the U.S. and the UK from all merchants, including the Plaintiff. It did so by concealing the true pathways the transactions followed and by concealing the fact that T1 Payments, LLC was not allowed to process credit card transactions during the times the Plaintiff were in contract in with T1 Payments, LLC. The only way the Plaintiff was able to discover the true fraudulent conspiracy between T1, Kasdon, King, Fairchild and T1's conspiring companies was because T1 Payments, LLC filed for Chapter 7 Bankruptcy protection, allowing the Plaintiff to review the documents they sent to the trustee and allowing the Plaintiff to subpoena Chase, American express, and Wells Fargo bank account statements through the bankruptcy. Exhibits 25, 26 & 29. Further, Debra King *and the Pixxles entities all refused to respond to the discovery about their network of companies inthe previous cases filed against them*. The scheme is numbered by steps and separated by entities below:




53. To clarify the chart: (1) Gaia's United States customers input their orders and credit card numbers into Gaia's website—the same website that T1's employees directed Gaia to change to include a UK company name and address at the bottom, "Mitragaia, LTD"; (2) instead of T1 Payments, LLC processing the U.S. transactions from the website as promised, it directed a foreign company in the UK "TGlobal Services, LTD (UK-1)" to take the customer payments attached to the orders (along with all other merchants' orders who signed up with T1 Payments, LLC in the U.S.) and aggregated them all into one portfolio; (3) TGlobal Services, LTD then initiated large credit card transactions from the UK to Payvision in The Netherlands, as if Gaia's customers' requests in the U.S. were TGlobal Service, LTD's customer's requests in the UK; next (4) Payvision processed what appears to be huge TGlobal Services, LTD transactions; then (5) Payvision apparently paid some of the funds to T1 Payments, LTD in the UK, TGlobal Services Limited (Isle of Man), and then some

of the funds to its subsidiary, PayVision Risk, Inc., in New York; (6) Payvision Risk, Inc., then paid funds to TGlobal Services, LLC's bank account in Nevada, while; (7) T1 Payments, LTD pays some funds from its UK bank account to T1 Payments, LLC's bank account in Nevada until that account closed in January 2021; then (8) TGlobal Services, LLC transferred the bulk of the merchant funds it received to Actum Processing, LLC in Austin, Texas for processing; then (9) Actum Processing separated the funds into the 500 separate merchant accounts T1 Payments, LLC promised to service; and (10) made payments to T1 Payments, LLC (until January 2021) and to the merchants; (11) & (12) some funds were received by T1 Payments, LLC (until January 2021) and Gaia, respectively.

54. These transactions happened every single day from September 2, 2020, to May 28, 2021, the time during which the Plaintiff was in a so-called contract with T1 Payments, LLC, with each company in the chain removing service fees and other miscellaneous fees at the direction of T1. T1's agent, Kasdon, helped T1 hide the missing money by terminating one merchant every month, simply taking all of its funds without notice, and using said funds to pay out the remaining merchants, much like a pyramid scheme. T1 also directed some of these funds to be diverted to the UK where they were building the new "Pixxles" brand to take over all of T1's fake credit card company and its defrauded merchants.

55. In all events, neither Gaia nor Mitragaia, LTD ever signed an agreement with Payvision or the other T-Companies. Payvision and the other T-Companies were not named anywhere on any document Mitragaia, LTD signed, and Mitragaia, LTD never would have entered into any relationship with T1 Payments, LLC, Payvision, or anyone else had it known that so many other companies were involved, that the process was illegal and in violation of the Card Brand rules, much less that they would each withhold and then steal Gaia's money after May 28, 2021.

*Payvision's Notice of Termination of TGlobal, LTD's Contract & the Shift to Pixxles*

56. There is one other event that is relevant to T1's scheme. On December 16, 2020, just three months after the Plaintiff was duped into signing the agreement with T1 Payments, LLC, Payvision, B.V. notified T1's conspiring partner TGlobal Services, LTD in writing that it would no longer take part in the scheme to secretly process T1's merchants' customers' credit card payments. At the time, ING undertook an audit of Payvision's business pending its purchase of Payvision. Doubtlessly the audit revealed Payvision's agreement with TGlobal Services LTD (which was not a licensed Payment Facilitator) and Rudolph's non-stop correspondence with T1's agent, Kasdon. Payvision sent a second letter on December 18, 2019 clarifying its termination of TGlobal Service LTD's contract. Both letters notified T1 Payments in clear and unambiguous terms that Payvision would be terminating TGlobal Service, LTD's account on or after March 18, 2021.

57. *Instead of notifying the Plaintiff that they should seek a real credit card processor, T1 increased the volume of transactions allowed for the Plaintiff on or about December 20, 2019*, which the Plaintiff believed may have been a reward for Gaia's good business. In reality, T1 was *only attempting to increase the amount of Plaintiff' money it and its conspiring companies controlled before its scheme ended*. T1, Kasdon, Fairchild and King worked together using the T-Companies as alter egos, and as their instrumentalities, to continue to "process" Plaintiff' transactions, and to gather as much money as possible from the Plaintiff, before Payvision's termination.

58. After PayVision terminated T1 Payments, LLC's ability to transact business on May 28, 2021, by terminating TGlobal Service, LTD's ability to transact business, T1, Kasdon, Fairchild and King jointly and in concert with one another held Four Hundred Fourteen Thousand, Three Hundred Thirty-Two Dollars & Ten Cents ($414,332.10) owed to the Plaintiff.

59. Instead of admitting what happened and returning the Plaintiff' funds,T1 announced to its employees in the shared T-Companies offices that it was initiating an emergency "corporate restructuring" of T1 Payments. *T1's agent, Kasdon, at T1's behest directed all of his employees to*

*shift all of the T-Companies' business to "Pixxles, LTD," another UK company under T1's control that purported to be a payment processor, effective immediately.*[6] After the announcement by T1's agent, Kasdon, Lisa Kaye, Vice President of Business Development for T1's agent, Kasdon's companies, secretly warned merchants that their merchant reserve accounts were in jeopardy of being misappropriated. T1 Payments, LLC sued Kaye into silence in California in 2021.

*Substantial Amounts of Money Began Leaving the T-Companies*

60. Also, that same day,T1's agent, Kasdon began exchanging phone calls and emails with the Plaintiff, promising them they would get the $353,413.67 being withheld in 10% monthly payments each month until paid. That never happened.

61. T1 also began shifting funds to Deep Pockets, LLC, as well as Pixxles Global, LTD, Pixxles, LTD, Pixxles, LLC and PXLS, LLC (hereinafter referred to collectively as the "Pixxles Companies"), among other companies. T1 directed King to withdraw funds from all the U.S. T-Company accounts (which were under her name as the manager of the T Companies) and to transfer them to , Deep Pockets, LLC, and to the Pixxles Companies. T1 then directed Fairchild, Scott Adrian Metcalfe Dawson, director of Pixxles (and former T1 Payments, LLC Employee), Salma Begum Kamaly, director of Pixxles, and Kenneth Pereira, director at Pixxles, to accept those fraudulently transferred funds through their positions as the directors of the Pixxles, LTD and Pixxles Global, LTD. T1 also directed all of T1 Payments, LLC's incoming clients to Pixxles as well, and directed Fairchild, Dawson, Kamaly and Pereira to sign them up for payment services under the new brand in the UK.

[6] In 2018, T1's agent, Kasdon, at T1's behest, directed his girlfriend (Fairchild) to form two Nevada LLC's: Pixxles, LLC, and PXLS, LLC. He also directed her to form UK companies: Pixxles, LTD & Pixxles Global, LTD. These companies had no business from their formation, until May 28, 2021, but were planned to be UK-based payment processors. Fairchild had no responsibilities at Pixxles except to follow T1's agent, Kasdon's instructions.

62. Expecting this scheme to be terminated in March 2021, T1 had already directed King to transfer £1,415,001 to the Pixxles companies on March 31, 2021, through one or more of its shell companies or through one or more of its attorneys. After Payvision finally terminated T1's scheme, T1 directed King to transfer another $2.8 million to their attorneys at Kaplan Cottner LLC on June 8, 2021, while at the same time, Pixxles, LTD received a capital increase of £1,737,212 (close to the exchange rate at the time for 2.5 million USD) either directly from Kaplan Cottner, LLC directly, or through another entity controlled by Kasdon like Pixxles Global, LTD, as directed by T1.

63. Kaplan Cottner facilitated, ratified, furthered, and materially participated in the theft, deception, and fraud through this secret agreement with T1's agent, Kasdon, Fairchild, and King, and other illegal misconduct as well as the principal-agent relationship it formed between itself and T1's agent, Kasdon, Fairchild, and King, and the T-Companies.

64. Next, T1 directed the transfer of $3,946,820.00 to Deep Pockets, LLC which owned the Deep Pockets Trust, which used the money to purchase a $5 million house on Miami Beach to keep as a homestead against judgments. See Exhibit 27 & 28. His attorneys at Kaplan and Cottner, LLC were also the registered agents for that fund.

65. T1 continued directing King to send the same law firm $75,000.00 in September 2021, $65,000.00 in October 2021, $57,000 in November 2021, and $44,000.00 in December 2021.

66. T1 also directed King to begin taking withdrawals in the form of cashier's checks out of the T-Companies in the amounts of $300,000.00 to $500,000.00 each month thereafter, beginning with a withdrawal of $400,000.00 on June 17, 2021.

67. T1 also directed King to transfer $325,000.00 to Lending Club Bank in October 2021.

68. By November 9, 2021, T1 directed the formation of "Pixxles Global, LTD" in England apparently for use as a holder of funds from TGlobal Services, LTD to Pixxles, LTD.

69. T1 also directed King to transfer *$25,000.00 a week* more or less to Venable, LLP beginning in 2022, resulting in payments to that firm in the amount of $200,000.00-$300,000.00 a month until February of 2023.

70. Between June 3, 2021, and June 3, 2022 (one year after the Plaintiff' money was withheld Kasdon's companies) King had already withdrawn or transferred away $11,899.894.40 from TGlobal Services, LLC's bank account, leaving it empty, at the direction of T1.

71. Due to T1's unlawful acts, in addition to the loss resulting from T1 Payments, LLC's fraudulent inducement of Plaintiff to contract with T1 Payments, LLC, Plaintiff suffered further extensive losses when T1 Payments then failed and refused to release hundreds of thousands of dollars from Plaintiff' reserve account. This unlawful withholding of funds was a direct violation of the written terms of the "Merchant Term Acknowledgment and Processing Agreement" between Plaintiff and T1 Payments (hereinafter, the "Agreement") a true and correct copy of which is attached hereto as Exhibit 1. Defendant has wrongfully held funds due and owing to Plaintiff for nearly a year totaling over Three Hundred Fifty-Three Thousand, Four Hundred Thirteen Dollars & Eighty-Seven Cents ($353,413.87).

*Legitimate Acquiring Banks Worked with T1's agent, Kasdon and T1 Payments for the Money for a Decade*

72. T1 spent a decade covertly using legitimate credit card processing companies (known as "Acquiring Banks") and secret entities controlled by themselves, to float their fake credit card processing company, T1 Payments, LLC. T1 Payments, LLC was never a real credit card processor, so in order to attract merchants, T1 needed Acquiring Banks with the ability to process credit card transactions to allow the Owners to use their services. To make the arrangement work, T1 oversaw and directed the aggregation of hundreds of merchants' credit card transactions into one account under his control, and then sent them for processed by various Acquiring Banks. The Acquiring Bank

then paid the funds back to one of T1's other conspiring companies, which in turn paid the individual merchants their part of the payments their customers made. T1 used Atlantic Pacific Processor, Synoptic, Vantiv and then Payvision B.V. to process payments for T1's fake credit card companies so they could induce merchants to use their company and receive small fees for every transaction.

73. Legitimate credit card processing companies made these arrangements with people like T1because the Acquiring Banks know there are tens of thousands of so-called "high-risk merchants" in the U.S. that they cannot service under the credit card rules promulgated by Visa and Mastercard and their banks. Those banking rules prohibit the Acquiring Banks from processing credit card payments for merchants that sell services and products online known to be ripe for chargebacks through no fault of the merchants.

74. As a result, these Acquiring Banks made private deals with T1 to create companies to be their confidential intercessor with these high-risk merchants. Numerous lawsuits and complaints have been filed against well-known credit card companies for participating in this behavior over the past few decades.

75. Without willing companies like T1 and TGlobal Services, LTD and TGlobal Services, LLC,these banks would be restricted from earning all the transaction fees for processing these high-risk merchants' payments. Since these banks want to collect all that high-risk money on the table, companies like T1 happily step in to act as middlemen, even if it means they would likely be left holding the bag if and when the Acquiring Bank gets caught by compliance investigators and are forced to terminate their arrangements with them. Indeed, this same termination has happened to T1 and its conspiring companiesseveral times, but they kept finding more acquirers to do business with.

*T1's History with Atlantic-Pacific, Synoptic, Vantiv, and Payvision*

76. First, after T1 found access to payment processing through "Atlantic-Pacific Processing Systems" in 2012, Kasdondirected Debra King, to form T1 Payments, LLC and name herself as its

managing member on January 10, 2012.[7] T1created a merchant contract that made it appear to merchants that they were contracting with T1 Payments, LLC as their full-service credit card processing company. The contract appeared to give T1 Payments, LLC the right to terminate any merchant contract for any reason and keep all the funds owed to the terminated merchant in some circumstances. That is the same contract involved in this case. Eventually, after being named as co-defendant in several lawsuits for stealing from its merchants, Atlantic-Pacific terminated T1 Payments LLC's ability to pretend to process payments.

77. Next, T1 found connections at Synoptic and Vantiv, other Acquiring Banks, through which the Owner could run the same scam. After several more lawsuits against T1 Payments, LLC (while it was involved with Synoptic in the U.S.) Synoptic also terminated T1 Payments, LLC's arrangement.

78. As a result of the above, T1 directed King and Fairchild to form T1 Payments, LTD discussed above. The new company was created to run the same scam through Payvision, B.V. in the Netherlands because Kasdon no longer had any guarantee that and acquiring bank in the U.S. would continue to work with him. Eventually, Payvision, B.V. terminated T1 Payments, LTD. due to the Owners' theft of merchant funds, and misuse of Payvision's banking system.

79. However, T1's agent, Kasdon and Rudolph Booker (the owner of Payvision, B.V.) were friends. As such, they decided to run the same scam again. They agreed there was too much money in the high-risk merchant arena to let it go to waste. As a result, T1 directed Kaisen and Fairchild to form TGlobal Services, LTD, also in U.K., on April 10, 2018.[8] Booker and T1 set up a similar agreement to the one Payvision had earlier with T1 Payments, LTD before it even existed.

---

[7] The Owners could not use T1's agent, Kasdon's name in the company for fear his judgment creditor/franchisor "Cold Stone Creamery" would collect T1 Payments' assets in satisfaction of a judgment against T1's agent, Kasdon for a franchise lawsuit.

[8] Even though TGlobal Services, LTD was doing business, it was always publicly designated as a dormant company since its inception.

80. The T Companies set up by Fairchild and Dawson at T1's direction were all used interchangeably to hold and transfer and freely spend merchant funds that were stolen, depending on T1's whim.

*Pixxles Companies Revisited*

81. As more lawsuits began piling up for more theft of merchant funds, T1 directed Fairchild to form the Pixxles Companies as described hereinabove. Pixxles, LTD would become an online bank registered in the U.K that has also entered into an agreement with Payvision. See Exhibit 21. It was also meant to take over all of T1's merchant contracts.

82. After Payvision's cancellation of the contract with TGlobal Services, LTD, T1 transferred any new customers trying to sign up with T1 Payments into a contract with Pixxles, LTD and hoped it would shield those funds from any merchants who became judgment creditors. Fairchild was the named director. "PXLS, LLC" was formed on October 15, 2018, "Pixxles, LLC" was formed in Nevada on December 7, 2018, and Pixxles Global LTD was formed on September 9, 2021, as sister companies to the U.K. Pixxles. Money is freely transferred between these four companies as well without regard for accounting, just the way money was transferred freely between the T companies.

83. Using these companies, created specifically for the purpose of moving and hiding unlawfully stolen funds, T1 converted the funds of the Plaintiff that were supposed to held in reserve and then paid out by T1 Payments, LLC.

84. T1 directed funds to Pixxles, LTD with £1,415,001 on March 31, 2021 and £1,737,212.00 on June 3, 2021, just days after refusing to pay the merchants in this, and other, cases. Despite the massive funding flowing to Pixxles, <u>neither Pixxles, LLC, nor Pixxles, LTD, nor PXLS, LLC, nor Pixxles Global, LTD were doing any business</u> according to T1's agent, Kasdon's September 22, 2021 testimony. T1's agent, Kasdon, called the Pixxles entities "<u>a giant paperweight for Amber. It does</u>

nothing. It generates nothing, it hasn't generated anything. It has no clients, it has nothing. Zero." In a later deposition he admitted it was created to take over T1's merchants.

85. Fairchild, the owner of record for the Pixxles, LLC, PXLS, LLC, and Pixxles, LTD also testified that these companies do no business and have never generated any revenue, despite the massive funding they received—coinciding with their refusal to pay the merchants like the Plaintiff owed funds. Fairchild also testified that she could not remember why she created the Pixxles, LTD, Pixxles, LLC or PXLS, LLC, and that they have never had any assets—again, despite the massive funding in 2021.

86. These individuals, at T1's demand,set up mirroring Pixxles companies in the U.S and U.K. exactly like they set up mirroring T1 Payments companies in both countries—and funded them at exactly the same time they wrongly withheld Plaintiff' funds. That is quite a coincidence.

87. Pixxles and Fairchild are currently using the funds stolen from the Plaintiff to start a new round of theft and fraud through these "Pixxles" companies.

88. Plaintiff files this lawsuit to protect its rights from a company that wasunfairly and illicitly using deceptive and fraudulent practices to continue to defraud and steal from the Plaintiff and others in the marketplace.

*The Contract*

89. There is no dispute that T1's conspiring companies are holding $353,413.87 of Gaia's money. There is a separate state court claim against those conspirators. In fact, T1 Payments, LLC alleged it was allowed to take the Plaintiff's money—and keep it in perpetuity—in accordance with the terms of the contract. T1 Payments, LLC alleged it "terminated the contract" and as a result of "terminating" the contract, it is authorized to keep all processed payments indefinitely, just in case T1 Payments, LLC incurs any losses in the future related to the "termination."

90. In other words, T1 Payments, LLC wants this Court to believe that the Plaintiff gave it $353,413.87 to indemnify it against the cost of a legal defense against the Plaintiff' claim for $353,413.87 presently before the Court. It is an absurd position to take in any court of equity, or in any court of law.

91. Also, that contention does not work in this case because none of his companies terminated the contract in this case, Payvision terminated his companies. Also, the contract was fraudulently induced both before it was signed, and within its paragraphs.

## A. BASICS OF THE CREDIT CARD BUSINESS ENVIRONMENT

92. To make online sales and take credit card payments, a merchant like Gaia must first open a "merchant account" for payment processing services by entering a "merchant agreement" with an "Acquirer" contracted with a "Payment Brand" (e.g., Visa, Mastercard, etc.) as a member bank. Such Acquirers have direct agreements with the Payment Brands that enable them to process payments made by holders of debit and credit cards ("Payment Cards") issued by the Payment Brands to purchase goods and services from merchants that contract directly with such Acquirers for merchanting processing services. This process is called "Acquiring."

93. Acquirers in turn may contract with third party organizations that provide payment processing related services ("Program Services") to merchants under the Acquirer's sponsorship with the Payment Brands (such third-party organizations are referred to in the Visa rules as "Third Party Agents," and in the MasterCard rules and hereafter as "Service Providers").

94. A Service Provider is categorized by the Payment Brands based on the nature of the Program Services to be performed. For example, an Acquirer may sponsor a Service Provider as: i) an Independent Sales Organization ("ISO" or "ISO-M") to solicit merchants for Program Services on its behalf (including application processing, customer service and statement preparation not affording access to account data or transaction data); ii) as a Third Party Processor ("TPP") to provide

authorization services, clearing file preparing and submission, settlement processing (excluding possession, ownership, or control of settlement funds, which is not permitted), merchant statement preparation, fraud control and risk monitoring, and/or chargeback processing; or iii) as a "Payment Facilitator" (herein a "PayFac") to contract directly with merchants as an agent of the Acquirer, and submit to the Acquirer records of valid transactions submitted to the PayFac by its sub-merchants, timely pay sub-merchants for transactions submitted to the PayFac by the sub-merchant, and provide recurring education and training to sub-merchants to ensure their compliance with the Rules.

95. T1 Payments, LLC was registered solely as an ISO with Visa until 2017 but was not otherwise registered with the Payment Brands as a Service Provider.

96. Visa defines ISO-M Program Services in the following manner: "Conducts merchant account or transaction processing solicitation, sales, customer service, merchant training activities and/or solicitation and sales of POS terminals and/or mPOS devices. It does not have access to the merchant cardholder data (CHD) or the cardholder data environment (CDE). It may also sell or resell gateway services (i.e., white label gateway) in conjunction with selling the merchant account and allow the merchant to implement a payment system solution without installing or configuring their own system."

97. Before an entity is authorized to perform a Program Service that supports or benefits an Acquirer's acquiring program (a "Program"), the Acquirer must verify that the entity; i) is operating a bona fide business; ii) has sufficient safeguards in place to protect account and transaction data from unauthorized disclosure or use, iii) complies with applicable laws and the Rules; and iv) cause such an entity to be registered by the Payment Brands as a Service Provider. A Service Provider may perform only the type of Program Service it is registered to perform and must be registered with the Payment Brands to perform such particular category of Program Service before an Acquirer or merchant may use its services.

98. The Acquirer must at all times be entirely responsible for, and must manage, direct and control, all aspects of its Program and Program Services performed by Service Providers and establish and enforce all Program management and operating policies in accordance with the Rules. An Acquirer must not transfer or assign any part of such responsibilities, or in any way limit its responsibility, with regard to any of its Service Providers. An Acquirer must conduct meaningful monitoring of its Service Providers to ensure ongoing compliance by its Service Providers with the Rules.

99. A Service Provider must not have access to any account for funds due to a merchant or withheld from a merchant for chargebacks, unless it is a PayFac Service Provider. An Acquirer must not assign or transfer to a Service Provider an obligation to pay or reimburse a merchant if the obligation arises from the merchant's processing activity. See e.g., Mastercard Rule 7.3[1]. Discount rates (or similar charges called by other terms) due to an Acquirer from a Merchant must be collected directly by the Acquirer and not by the Service Provider. See e.g., Mastercard Rule 7.6.2[2]

100. In summary, the Rules for all Payment Brands like Visa and Mastercard broadly prohibit an ISO Service Provider from (i) contracting directly with a merchant, without the Acquirer as a party to the agreement, (ii) handling or having access to the proceeds of the merchant's processing activity, including deducting fees therefrom, (iii) holding merchant reserves, and/or (iv) settling the merchant's account (i.e., paying the merchant for its transactions). The only Service Provider authorized to directly handle merchant money is a registered PayFac.

101. A PayFac is: "A type of third-party agent that can 1) sign a merchant agreement on behalf of an Acquirer, and 2) receive settlement funds from an Acquirer on behalf of a sponsored merchant. Payment Facilitators may have access to cardholder data ("CHD") or the cardholder data

[1] https://www.mastercard.us/content/dam/mccom/global/documents/mastercard-rules.pdf at p. 157.
[2] Id. at p. 159.

environment ("CDE"). For example, PayFacs that protect, secure, store, process, or transmit cardholder data are contracted with an Acquirer to provide payment services to sponsored merchants such as i) soliciting sponsored merchant for Visa/Mastercard acceptance; ii) contracting with sponsored merchants to enable Visa/Mastercard payment acceptance; iii) monitoring compliance of sponsored merchant activity in accordance with the Visa/Mastercard Rules; and iv) receiving settlement of transaction proceeds from the acquirer on behalf of the sponsored merchant. These PayFacs must be located within the acquirer's jurisdiction and cannot be listed on the Terminated Merchant File ("TMF"), or similar files, nor can they act as a sponsor for another Payment Facilitator. See e.g., Mastercard Rules 7.1[3] and 7.13[4].

102. As such, the Plaintiff needed a <u>legitimate</u> payment processor relationship to (i) handle necessary compliance related issues to ensure that its kratom products were sold in compliance with the Rules to ensure that Gaia's customers could use Payment Brands issued Payment Cards' to make those purchases and to (ii) provide refunds to Plaintiff' customers who request their money back for some reason, in addition to handling purchases. Gaia could not fully operate without contracting with a <u>legitimate</u> payment processor since its entire business model solely used the internet to make sales.

## B. T1 PAYMENTS FALSELY HELD ITSELF OUT AS A PAYMENT FACILITATOR

103. T1 Payments, LLC falsely held itself out to the public as a PayFac when it entered into the agreement with the Plaintiff.[5] As T1 Payments, LLC stated in the About section of its LinkedIn page as of May 2021: "T1 is a whole new kind of merchant processor, a Payments Facilitator. Our services are different from your traditional merchant provider because it gives your online business an end-

---

[3] Id. at 143.

[4] Id. at 176.

[5] A search of the Visa Global Registry of Service Providers database for "T1 Payments" as of May 21, 2021 revealed one result: T1 Payments LLC, based in Nevada, USA, was registered as an "ISO-MERCHANT" until 2017. A true and correct copy of this search result is attached hereto as Exhibit 2 and incorporated herein by this reference as though set forth in full. As of May 21, 2021, there was no listing for T1 Payments in the Mastercard List of Registered Payment Facilitators.

to-end solution from a single company, totally dedicated to our 100% satisfaction and success. Because T1 Payments is a Payments Facilitator, you do not have to deal with lengthy applications or cumbersome underwriting requirements." See Exhibit 5.

104. However, T1 had not been a PayFac since January 25, 2017 - and then only briefly due to its fraud and theft of funds.

## C. T1 PAYMENTS AGGRESSIVELY MARKETED TO KRATOM MERCHANTS

105. While kratom products are legal in the United States, the Payment Brands and Acquirers classify kratom as a "high risk" industry because it is prone to chargebacks, and because of reputational risk related to the still-stringent legal restrictions on other herbal products such as hemp and CBD. This means that kratom merchants like Gaia have less card payment processing solutions available to them than many other classes of e-commerce merchants and that they must often pay much higher fees for those services.

106. T1 Payments aggressively marketed to these merchants. T1 Payments, LLC described itself online as "one of the most reliable and longest standing kratom processors in the biz!" A representative sample of T1's statements in the advertisements from T1 Payments' LinkedIn stream promoting T1 Payment's status as "one of the longest standing kratom solutions" and most "reliable kratom processors" for both U.S. and International merchants is attached hereto as Exhibit 5.

107. In July of 2020, T1's agent, Kasdon, at T1's behest met with Gaia in Miami and again in Las Vegas, promising Gaia his alter-ego T1 Payments, LLC was a licensed Payment Facilitator, that it was in contract with Visa and Mastercard, and that the company was a full-service credit card processing solution doing everything in-house to keep costs down. T1's agent, Kasdon repeatedly promised that his company operated in compliance with all laws, regulations and Card Rules.

108. Gaia reasonably relied upon the representations in these meetings in deciding to contract with T1 Payments, LLC.

109. On August 12, 2022, the Plaintiff filled out T1 Payments' Merchant Service Application. *See T1 Payments Merchant Services Application* attached hereto as Exhibit 1.

*T1's Practice of Stealing from the Merchants After they Signed Up*

110. By holding T1 Payments, LLC out as a direct payment processor, that it operated in compliance with all laws, regulations, and Card Rules, and promising the Plaintiff that T1 Payments was a Payment Facilitator, T1 expected merchants like Gaia to believe it. T1 Payments continued to promote the legality and reliability of the services offered, all while lacking any authority to facilitate payments, to entice merchants like the Plaintiff. Gaia had no real way of learning he was lying because the contracts and correspondence and bank records were all private and held closely in secret by T1.

111. T1 has an established track record of using these tactics to entice unwitting kratom and other "high-risk" merchants to contract with it for purportedly "authorized" processing services (described hereinbelow).

112. Moreover, after entering into these fraudulent agreements—instead of even *attempting* to act as a conventional PayFac—T1 escalated its illegal and rule violating activities, by processing merchant's transactions illegally by pooling their accounts and money into one, unrelated, third-party merchant account (a practice known as "credit card laundering," "factoring," or "aggregation"), without the merchants' knowledge. T1 committed this credit card laundering, all while encouraging the merchants to increase their processing activity. When merchants' "merchant account" amassed a large enough sum of money, T1 would suddenly terminate that merchants' ability to continue processing-just before seizing the merchant's funds using sham justifications. T1 constantly blamed fictitious chargebacks and similar spurious risk concerns in emails to merchants as a false pretense for his conduct. T1's next maneuver was to assert an Early Termination Fee ("ETF") provision contained in the underlying fraudulent agreement to justify his companies' refusal to return any

portion of the merchant's funds - notwithstanding the fraudulent nature of the underlying contract as a whole, and the illegal nature of the ETF as an unlawful penalty. Finally, T1 withheld entire merchant accounts from merchants, including the Plaintiff, under an untriggered termination provision in his fraudulently induced contract. That provision was not applicable in this case.

*T1's agent, Kasdon's Legal History*

113. There are dozens—if not hundreds—of merchants just like the Plaintiff who have experienced the exact same treatment and theft from T1 Payments. T1 made off with millions of dollars of illicitly gained funds from its "high-risk" merchants.

114. The numerous lawsuits and counterclaims filed against T1's agent, Kasdon and T1 Payments speak to the nature of this conduct as part of a pattern and practice, including but not limited to the following cases on file: (1) *Dermaktive LLC et al. v. Atlantic-Pacific Processing Systems Inc. et al.*, Eighth Judicial District, Clark County Nevada, Case No. A-16- 737420-B, filed May 26, 2016; (2) *Vantiv LLC v. T1 Payments LLC*, United States District Court for the Southern District of Ohio, Western Division, Case No. 1:17-cv-00164-SJD, filed March 14, 2017; (3) *Onyx & Rose LLC v. T1 Payments LLC*, United States District Court for the District of Nevada, Case No. 2:20-cv-00008-KJD-NJK, filed July 3, 2019; (4) *PureKana LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:19-cv-01399-KJD-NJK, filed August 14, 2019; (5) *T1 Payments LLC v. New U Life Corp.*, United States District Court District of Nevada, Case No. 2:19-cv-01816-APG-DJA, filed October 17, 2019; (6) *T1 Payments, LLC v. Hannavas Enterprises, LLC*, United States District Court for the District of Nevada, Case No. 2:2020-cv-00411, filed February 27, 2020; (7) *First Capitol venture Co. v. T1 Payments, LLC*, Eighth Judicial District, Clark County Nevada, Case No. A-21-834626-B, filed May 14, 2021; (8) *Vida Davina, LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:2021-cv-01005, filed May 26,

2021; and (9) *Ibuumerang, LLC v. T1 Payments LLC*, United States District Court for the District of Nevada, Case No. 2:21-cv-01611-JCM-VCF, filed August 31, 2021.

**D. <u>T1 PAYMENTS' PROCESSING AGREEMENT WITH GAIA</u>**

115. The misrepresentations made by T1directly to Dan Bower were consistent with other misrepresentations T1historically made about Tl Payments, LLC to the public at large. For example, Tl Payments, LLC held out publicly as a payment processor via written marketing material advertising online that stated: "Our relationships with banks across the globe mean (sic) that we can find a happy home for most any business, international and domestic, and process payments in any currency;" "For businesses large and small, old, and new, experimental, or traditional, Tl [Payments] will customize the right solution at the right price. Within hours, you will be accepting all forms of payment quickly, easily, and securely;" and "Tl Payments is the next generation merchant processing company. Our services are different from your traditional merchant providers because it gives your online business an end-to-end solution totally dedicated to your 100% satisfaction and success. All under one bill, one processor and one flat rate."[9] [10]

<u>*i. T1 PAYMENTS REQUIRED A EUROPEAN SUBSIDIARY FOR GAIA*</u>

116. For reasons it did not elucidate, T1 Payments, LTD’s employee, Elisabeth Ravelo, filed a certificate of formation for "Mitragaia, LTD," a new company in Northern Ireland, on behalf of the Plaintiff. T1 Payments assigned that company to the Plaintiff as its alter-ego subsidiary. T1 told the Plaintiff it would be obligated to use the new United Kingdom subsidiary for all of its payment processing through T1 Payments.

---

[9] See https://t1payments.com/industries/hemp-cbd/

[10] https://www.businesswire.com/news/home/20201021005194/en/Leading-CBD-Merchants-Herbstrong-Sabaidee-and-ThoughtCloud-Turn-to-T1-Payments-for-Global-E-Commerce-Processing

117. T1 Payments required the Plaintiff to replace their U.S. company name and address with the new UK company and UK address on the Plaintiff's website. T1 Payments sent an edited website image for the Plaintiff to use in making these changes, among others. *Id*.

118. T1 Payments reviewed and filed all of the requisite documents for the new UK company through its "European Documents Specialist," Elisabeth Ravelo.

*ii. T1 PAYMENTS' PAYMENT PROCESSING AGREEMENT*

119. The "Payment Processing Agreement" and "Merchant Terms Acknowledgment" “Merchant Application” (collectively the “Agreement”) are attached hereto as Exhibit 1.

120. Under the Agreement, T1 Payments agreed to provide Gaia payment processing services including but not limited to clearing/settling Plaintiff's electronic sales with its customers using Cards. Under Section 1 of the Agreement titled "Definitions," the term "Card" means (i) a valid credit card or debit card in the form issued under license from a Payment Brand or (ii) any other valid payment card or other payment device offered by the Payment Brands and accepted by Merchant (i.e., Gaia). Further, also in Section 1 of the Agreement, the term "Payment Brands" means Visa, U.S.A. ("Visa"), Inc., MasterCard International, Inc. ("MasterCard"), American Express Travel Related Services Company, Inc., DFS Services LLC (owner of Discover) and their affiliates or any other payment networks offered by T1 Payments and accepted by Merchant. T1 Payments promised to provide, among other things, Card payment processing services which allows T1 Payments to clear payments for purchases of Merchant’s products and services via Cards. Merchant requests to have such payment processing services provided to it and T1 Payments agrees to provide such services subject to the terms and conditions contained in the Agreement. Exhibit 1.

121. The subject of the Agreement as stated in Section 2 of the Agreement was that Gaia agreed for Tl Payments to act not as a principal, but solely as a facilitator on its behalf of Gaia to enable it to process such payments.

122. Under Section 4.1 of the Agreement titled "Honor All Cards," T1 Payments, LLC promised "Merchant's payment transactions will be processed by T1 Payments pursuant to the terms of this Agreement, Payment Brand Rules, program rules and policies of its third party processors, and all applicable laws and regulations." Id. Gaia was required to honor all Cards (as permitted under the Agreement) when properly presented as payment in connection with a legitimate transaction.

123. The Processing Agreement required T1 Payments to promptly provide Plaintiff with the funds that Plaintiff earned from its customers' transactions submitted to T1 Payments under §6.2. The Processing Agreement was originally for a twelve-month term, and automatically renewable absent written notice from Plaintiff. The Parties performed under the Processing Agreement until on or around May 1, 2021, when Tl Payments failed to perform according to the terms thereof, which permanently fractured the parties' relationship, causing the subsequent events, problems and losses detailed below to occur.

*iii. GAIA LOST SERVICE ON MAY 1, 2021*

124. On or about May 27, 2021, the Plaintiff noticed the deposits from T1 Payments into its merchant bank account did not arrive as usual. After four more days of nonpayment, and confirmation from dozens of other kratom merchants that no one was being paid from T1 Payments, the Plaintiff realized something was amiss. Gaia was forced to stop accepting credit card payments. To make matters worse, if losing thousands of dollars in sales every day is not bad enough, Gaia was also unable to issue refunds to its customers through the usual T1 Payment channels those same customers just used to purchase their products.

125. On May 28, 2021, T1 Payments sent a generic, form-email notice to all of its clients, including Gaia, stating without explanation that its Acquirer (Payvision) had terminated its agreement with T1 Payments. The email stated:

> "For reasons outside of T1 Payments LLC's control, the acquirer (Payvision) associated with your account terminated the agreement that enabled T1 Payments

> LLC to continue servicing your account for new transactions. T1 Payments has attempted to resolve this issue but unfortunately was not able to come to a successful resolution. T1 Payments LLC regrets to inform you that your merchant account will be terminated effective May 31, 2021. T1 Payments LLC will continue to service the account for chargebacks and other post-termination matters as long as circumstances permit. All provisions set forth in the Card Payment Processing Agreement that survive termination of the agreement shall remain in full force and effect. We understand these are not ideal circumstances and want to ensure you that we will be reaching out to every merchant individually in hopes to resolve this amicably. Should you have any requests for refunds they must be sent to refunds@t1payments.com." *See May 28, 2021* Email attached as Exhibit 10.

126. Upon close review of the May 28, 2021 email, T1 Payments stated Payvision terminated the agreement that enabled T1 Payments, LLC to "service" Gaia's account—*not that T1 Payments terminated the contract*. Id. This fact alone disallows T1 Payments to rely on the termination provision they assert allows them to keep all merchants funds at their whim.

127. Further, T1 Payments notified the Plaintiff that their account *would be* terminated *at a later date*, but T1 Payments, LLC never sent a notice of termination on that later date, nor did it ever send a proper notice of termination pursuant to the terms and requirements of contract which require certain notices be sent to specific addresses and contacts before they are deemed sent.

128. At the time of the above email, T1 Payments, LLC, covertly using TGlobal Limited LLC's bank account, held Three Hundred Fifty-Three Thousand, Four Hundred Thirteen Dollars & Sixty-Seven Cents ($353,413.67) owed to and beneficially and legally owned by Gaia.

*iv. PAYMENTS AFTER PAYVISION'S MARCH 16, 2021 DEADLINE*

129. On March 31, 2021, T1 directed King to transfer £1,415,001 that made its way into the bank account owned by Pixxles Limited in the United Kingdom, which is controlled by T1Fairchild. *See Statement of Capital for Pixxles, Ltd. File Dated March 31, 2021*, attached hereto as Exhibit 11.

130. On June 4, 2021, T1 directed Fairchild or King to transfer £1,737,212 that made its way into the bank account owned by Pixxles Limited in the United Kingdom, controlled by Fairchild. *See Statement of Capital for Pixxles, Ltd. File Dated June 4, 2021*, attached hereto as Exhibit 12.

131. On June 16, 2021, T1 directed Fairchild or King to transfer £322,211.00 that made its way into the bank account owned by Pixxles Limited in the United Kingdom. *See Resolution of Pixxles, Ltd. File Dated June 16, 2021*, attached hereto as Exhibit 13.

132. To date, T1 Payments, LLC, its associated companies, subsidiaries and officers have refused to repay the remaining balance of Three Hundred Fifty-Three Thousand, Four Hundred Thirteen Dollars & Sixty-Seven Cents ($353,413.67) due to Gaia.

133. On March 29, 2022, T1directed Fairchild and King to transfer £2,810,733.00 that made its way into the bank account owned by "Pixxles Limited. " *See Pixxles Ltd Allotment of Shares Dated March 29, 2022*, attached as Exhibit 14.

## E. T1 PAYMENTS' STATUTORY & PAYMENT BRAND RULE VIOLATIONS

134. T1's ability to perform the services subject of the Processing Agreement between T1 Payments and Gaia depended on an illegal credit card laundering scheme, whereby T1 Payments presented Gaia's customers' Payment Card transactions to an undisclosed bank for authorization, and processed and settled those transactions through an account held in the name of an imposter-merchant entity, as though they were that imposter merchant's customer transactions. By doing so, T1 Payments engaged in violations of 18 U.S.C. §§1001, 1029, 1343, 1344, 1956 & 1957.

135. Furthermore, because T1 Payments' promise to process Gaia's transactions constitutes the object of the Processing Agreement (i.e., the thing that T1 agreed to do in exchange for consideration), and because T1 Payments' ability to perform those services depended on an illegal solution, the Processing Agreement is void as an illegal contract, and public policy prohibits T1 from charging fees, or claiming any other benefit (limitation of damages or liability, etc.) thereunder. Plaintiff will describe in more detail below the violations of State and Federal Law after describing the numerous and widespread administrative violations that were knowingly undertook by T1 Payments.

*i. DEFENDANT'S PAYMENT BRAND RULE VIOLATIONS*

136. Based on Kasdon, King and Fairchild, Dawson, Kamaly, Pereira, and their Defendant Ccompanies'T1's illegal conduct and violation of the Rules, as detailed herein, Defendant is subject to MATCH-listing for credit card laundering (MATCH Code 03), violation of standards (MATCH Code 10) and illegal activity (MATCH Code 13). [11]

137. None of T1 Payments' c acts taken pursuant to the Processing Agreement were valid under the Payment Brand Rules. The Rules mandate that, except in the case of a registered PayFac, an Acquirer must have a direct written merchant agreement with each of its merchants. *See e.g.*[12], Mastercard Rule 5.1; Mastercard Rule 7.6.1; and Visa Core Rule 1.5.2.1.[13] A review of the Mastercard Payment Facilitator list and the Visa Global Registry of Service Providers confirms that, while T1 Payments was registered as an ISO at all times complained of herein, T1 Payments was not registered as a PayFac.

138. Even if T1 Payments *wa*s a properly registered as a PayFac when it purported to be, the Rules would still require-*at a minimum*-that T1 Payments' Processing Agreement identify the Acquirer (Payvision), disclose contact information of the Acquirer to address questions and concerns, and reflect that T1 Payments entered into the Processing Agreement on behalf and as an agent of the identified Acquirer. *See, e.g.*, Mastercard Rule 7.8.1. Obviously, since T1 Payments had no contractual relationship with an Acquirer, it could not take any of these steps. T1 directed the transactions take place anyway.

---

[11] The MATCH list is a record of merchants that are considered to carry an unacceptable level of risk. Banks, payment processors, and other financial institutions use this list to identify merchants that they might not want to do business with. MATCH is the rebranded version of an older, more aptly named list, the Terminated Merchant File (TMF).

[12] https://www.mastercard.us/content/dam/mccom/global/documents/mastercard-rules.pdf

[13] https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf

139. Most importantly to Plaintiff is that the Payment Brand Rule mandate that, except in the case of a properly registered PayFac, the Acquirer alone must have exclusive control over merchant funds and reserves. *See e.g.*, Mastercard Rule 7.2.1; Mastercard Rule 7.3; Mastercard Rule 7.6.2; *and see* Visa Core Rule 1.5.8.2. In direct contravention of the Rules, the Processing Agreement in issue provides for T1 Payments to assess and deduct service fees, withhold funds, maintain reserve account funds, and make payments to Gaia *directly* from the proceeds of Gaia's processing activity. All of which proves T1 Payments was in receipt of those funds in violation of the Rules. *See* Exhibit 1 at the Processing Agreement ¶¶ 5.7, 6.1-5, 6.8, 7, 8.1-5. T1 Payments directly violated the Rules with each of these provisions at the direction of T1.

140. Even T1 Payments' website reveals that T1 Payments is in violation of the Rules requiring each registered Service Provider/Third Party Agent to disclose the sponsoring member bank on its brochures, website, and other marketing materials. Notwithstanding T1 Payment's status as a registered ISO of Visa, T1 Payments, at the direction of T1, failed to disclose its relationship to any sponsoring bank on its website and marketing materials.

141. Indeed, T1 Payments was directed not to open any merchant account in the name of Gaia at all, but instead to process Gaia's transactions through a merchant account held in T1 Payments name or the name of a third-party entity. This practice is variously known as "credit card laundering," "factoring" and "aggregation," and is an illegal practice which is a variation on money laundering. Aggregation means laundering or factoring multiple merchants' transactions through a single account held in the name of a third-party entity.

*ii. T1 PAYMENTS' VIOLATIONS OF STATE & FEDERAL LAW*

142. During the parties' business relationship, T1 periodically offered to increase Gaia's processing limits while repeatedly representing that the Plaintiff' stated monthly volume was not a "hard limit." This was because T1 was "cascading" or "load balancing" the merchant's transactions

across multiple merchant accounts held in the names of third parties-moving the processing activity to a different merchant account each time the monthly volume limit is reached on the preceding account. Thus, if each merchant account has a monthly volume limit of $200,000.00 like the Plaintiff began with, the processor could illegally cascade the merchant's transactions three times (*i.e.*, launder the merchant's transactions through three different MIDs) to accommodate a $600,000.00 limit.

143. The nature of T1 Payments' reporting and the lack of any merchant portal other than the third-party NMI Gateway[14] also indicated that T1 Payments was illegally aggregating (laundering) transactions. Legitimate Payment Facilitators provide their merchants with real time reporting through a merchant portal. It enables the merchant to view all merchant account activity as it happens. Illegitimate processors like T1 Payments <u>cannot provide that function because they are processing a merchant's transactions through another party's merchant account with another Acquirer/Processor/Service Provider</u>. Thus, to provide reporting, illegitimate processors like T1 Payments provide their reporting in the form of spreadsheets instead of formalized merchant statements. Indeed, T1 Payments never provided Gaia with a single monthly statement, but instead provided only daily deposit reports via e-mail generated from the NMI gateway platform. This is another telltale sign of illegal processing activity.

144. The federal crime of access device fraud is embodied in 18 U.S.C. §1029, which provides definitions of credit card fraud, including that, "Whoever, without the authorization of the 'credit card system member' (i.e., Acquirer) or its agent, knowingly and with intent to defraud, causes or arranges for another person to present for payment, one or more evidences or records of transactions made by an 'access device' (i.e., a credit card) shall, if the offense affects interstate or foreign commerce, be

---

[14] The back-end user access provided by T1 Payments to Gaia was through the NMI gateway (NMI.com) not through a Customer Relations Management System that was proprietary to T1 Payments.

punished as provided in subsection (c) of this section." The sentencing guidelines are set at 10 to 20 years and forfeiture of all illicitly gained property and funds. By presenting Gaia's customers' Payment Card transactions to an Acquirer as another entity's customer card transactions for authorization, processing and settlement, T1 Payments engaged in access device fraud in violation of 18 U.S.C. §1029.

145. By using electronic communications to capture and transmit payment information from Gaia's customers to an Acquirer through another entity's merchant account in violation of 18 U.S.C. §1029, T1 Payments also engaged in wire fraud in violation of 18 U.S.C §1343.

146. 18 U.S.C. §1343 provides that, "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. §1343 defines the term "scheme or artifice to defraud" to include a scheme or artifice to deprive another of the intangible right of honest services.

147. Likewise, by presenting Gaia's customers' Payment Card transactions to an Acquirer through another entity's merchant account, T1 Payments also knowingly executed a scheme or artifice to obtain funds under the custody or control of both the card-issuing bank and the Acquirer by means of false or fraudulent pretenses. Thus, T1 Payments, along with Kasdon, Fairchild, and King also engaged in bank fraud within the meaning of 18 U.S.C. §1344. This same conduct also constitutes false statements to a bank in violation of 18 U.S.C. §1001. All these crimes carry penalties ranging from 10 to 30 years imprisonment, and/or fines of up to $1 Million per offense.

148. T1 Payments' conduct also constitutes laundering of money instruments. By having Gaia's customers' Payment Card transactions processed through another entity's merchant account and then

having the proceeds deposited into T1 Payments' own bank account, T1 Payments engaged in financial transactions involving the proceeds of "specified unlawful activity" flowing from T1's's acts of access device, wire, and bank fraud, as described above. Thus, this conduct constitutes violations of 18 U.S.C. §§1956 and 1957.

149. 18 U.S.C. §1956(a)(1) in relevant part provides that, "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-(A)(i) with the intent to promote the carrying on of specified unlawful activity; or … (B)(i) knowing that the transaction is designed in whole or in part-to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity…shall be sentenced to a fine of not more than $500,000.00 or twice the value of the monetary instrument or funds involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both." 18 U.S.C. §1956(c)(7) defines the term "specified unlawful activity" to include any act or activity listed as an offense in Section 1961(1), which, in turn, defines "racketeering activity" to include, inter alia, any act which is indictable under 18 U.S.C. §§1029 (credit card fraud), 1343 (wire fraud), and 1344 (bank fraud). T1 committed all these crimes through its scheme.

150. Separately, 18 U.S.C. §1957 makes it a federal crime to knowingly engage or attempt to engage in a monetary transaction involving more than $10,000.00 derived from any of these same types of "specified unlawful activity" such as the Defendant engaged in.

151. Finally, the defendant also engaged in unlicensed money transmission in violation of the Bank Secrecy Act (BSA). Under the BSA, a money transmitter is a type of Money Services Business (MSB) and is defined to include a person that "provides money transmission services, or any other person engaged in the transfer of funds." 31 C.F.R. § 1010.100(ff)(5)(i)(A) and (B). The term "money

transmission services" means "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." 31 C.F.R. §1010.100(ff)(5)(i)(A). No activity threshold applies to the definition of a money transmitter. Thus, because T1 engaged in the transfer of funds for their businesses, they are an MSB as a money transmitter, regardless of the amount of money transmission activity. King's transfers and withdrawals at T1's behest fall into this category.

152. By accepting settlement funds from Acquirers located abroad for transmission to Gaia's bank account in California, T1 engaged in money transmission within the meaning of the BSA. A search of the FinCEN MSB Registrants[15] confirms their lack of registration as a money transmitter, or any type of MSB.

153. They also do not fall within any of the exemptions to registration as a money transmitter.

154. As such, T1 is likely subject to a civil penalty of $5,000.00 for each violation of BSA registration requirements in an amount up to $5,000.00 for each day a registration violation continues for their failure to comply with the registration requirements set forth in 31 U.S.C. § 5330 and 31 CFR § 103.41. T1, Kasdon, Fairchild and Kingare also subject to fines and imprisonment of not more than five years pursuant to 18 U.S.C § 1960(a) for knowingly conducting, controlling, managing, supervising, directing, and/or owning all or part of an unlicensed money transmitting business. They are all also subject to fines and imprisonment of not more than five years pursuant to 18 U.S.C § 1960(b)(1)(B) for operating a money transmitting business that affects interstate or foreign commerce in any manner or degree and fails to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330.

---

[15] https://www.fincen.gov/msb-state-selector

155. T1's conduct also constitutes illegal money transmission under the laws of one or more states for the same reason, including Nevada.

### F. T1 PAYMENTS IS IN BREACH OF THE AGREEMENT

156. Pursuant to the Processing Agreement, which Defendant drafted and did not permit Plaintiff to edit in any manner, T1 Payments was required to "deliver payouts of amounts owing to Gaia as promptly as practicable after processing, subject to T1 Payments' rights to offset and holdback sums due to Plaintiff or collected from Plaintiff's sales…" *See* Exhibit 1. T1 Payments was to promptly deliver payments but was permitted to hold a Reserve Account of funds for nine months after the last card sale, refund, or chargeback occurred, or to hold back all funds if it properly terminated the contract. *Id*.

157. T1 never actually terminated the contract—it just stopped communicating with the Plaintiff, and kept their money anyway even after the nine-month period passed.

158. The Merchant Terms Acknowledgment stated the specific terms and pricing between Tl Payments and Gaia for credit card transactions. The most important term in the Acknowledgment was the Reserve Account terms which permitted a maximum of ten percent (10%) over the relevant 180-day period.

159. As of the commencement of this action, and well after: i) the 9-month period set forth under the Agreement; (ii) the last chargeback and/or refund had been processed under the Processing Agreement; and iii) Payvision discovered T1 Payments' fraud and terminated its ability to direct transactions under TGlobal, T1 Payments has continued to hold or hide the Plaintiff' funds from the associated Merchant Account and/or Reserve Account in Pixxles, LTD. Additionally, Tl Payments continues to attempt to justify its intentional and wrongful withholding of funds due and owing to Gaia in violation of the Agreement by inapplicably using the language "last transaction, chargeback,

or refund" as providing T1 Payments a contractual right to hold unilaterally these funds in perpetuity, with no intention of ever remitting these funds.

160. T1 Payments, LLC was also required to follow all laws, policies, regulations, and Card Rules in processing the Plaintiffs' payments—which it did not do as described in Section V(E) *supra*.

161. On numerous occasions since May 1, 2021, Gaia sought updates from T1 Payments regarding the transaction history related to its Reserve Account funds and demanded return of its money. T1 Payments employed evasive and deceptive tactics, imposing one artificial deadline after another, to avoid paying Gaia the revenues that it earned by providing products to its customers i.e., the balance of the Reserve Account funds.

162. Plaintiff expected, planned for, and relied on T1 Payments, LLC to release all revenue owed to it pursuant to the time permissible under the Processing Agreement. T1 however, had other plans for the funds, and directed them dispersed to the other conspiring companies, Pixxles LTD, and King and Fairchild. As a result of T1'sdisregard of Gaia's rights, Gaia's business was negatively impacted.

163. These individuals, in concert and in a joint venture and in conspiracy one with another, all under the direction of T1 are illegally keeping money that does not belong to them and which they have not earned, all as part of their premeditated, injurious business model. Plaintiff' funds were included in the millions of USD into British Pounds Sterling sent as "investments" into Pixxles, LTD in 2021, just before it stopped paying its merchants, including the Plaintiff, including <u>£1,415,001.00</u> on April 26, 2021; <u>£1,737,212.00</u> on June 4, 2021; and <u>£2,810,733.00</u> on March 29, 2022.

164. It is T1 Payments' business model to deprive merchants of their own money by directing the withholding of funds and making false claims for fees and costs, among other pretextual bases, along with him in his correspondence. T1dragged merchants along for months-or years, which is evidenced based on the previous lawsuits filed-by setting artificial, never-ending deadlines to force merchants

into paying fees that they do not owe while Defendant reaps the benefits of merchants' funds. Consistent with this scheme, T1 has deprived Gaia of funds that lawfully belong to it, have caused it to incur fees and costs associated with the instant lawsuit, and forced the Plaintiff to expend an undue amount of time, effort, and cost to recover said funds by inter alia making false claims for ETFs, non-existent chargebacks, phony, ongoing transactions that move the fraudulent goal posts ever forward and refusing to provide an accounting for Plaintiff's Reserve Account funds.

165. To date, and despite Gaia's numerous demands, T1 Payments refuses to abide by the Processing Agreement and refuses to deliver Gaia's own money to it.

## G. THE PROCESSING AGREEMENT IS ALSO VOID AS AN ILLEGAL CONTRACT

166. Based on T1 Payments' marketing materials, including its LinkedIn advertisements and account onboarding e-mails, and the representations of T1 Payments' representatives, under the direct supervision and control of T1, Gaia reasonably understood and believed that T1 Payments was offering a fully legal and compliant Program, and Gaia truthfully and accurately disclosed the nature of its business activities to T1 Payments when it applied for the subject processing services.

167. In fact, T1 Payments' ability to provide the subject payment processing services to Gaia depended on T1 Payments' acts of access device fraud, wire fraud, bank fraud, application fraud, money laundering and unlicensed money transmission. This is evidenced by the various Rules violations detailed above, specifically including the fact that (i) T1 Payments is not registered as a PayFac, (ii) T1 Payments' flexible monthly volume limits and eagerness to increase those limits, and (iii) T1 Payments' deficient reporting practices, specifically including its inability to provide real time reporting to its merchants.

168. Because T1 Payments' provision of the subject processing services constitutes the purpose of the Processing Agreement, and the basis for the fees to paid by Gaia to T1 Payments thereunder, the Processing Agreement has an illegal object that touches and taints the rest of the contract as a whole.

Thus, the Processing Agreement is void as an illegal contract. Of course, a void contract is a mere nullity, and wholly unenforceable.

169. Gaia reasonably relied on T1 Payments' repeated representations regarding the lawful and compliant nature of T1 Payments' processing solution and were justifiably ignorant as to the illegal manner in which T1 Payments set up the solution and performed the services subject of the Processing Agreement. Indeed, the Plaintiff did not learn about the illegal nature of the Processing Agreement, or the processing services provided thereunder, until their attorneys had investigated these matters and explained the illegality of Defendant's conduct to them.

170. T1drafted the Processing Agreement for the purpose of defrauding the Plaintiff, and to circumvent the Rules and federal law, and to conceal the unlawful nature of the services provided by T1. T1 is liable for the illegality of the services it provided under the Processing Agreement.

171. Thus, while public policy prohibits Defendant from claiming any benefit under the Processing Agreement, Plaintiff may enforce their claims against T1 Payments pursuant to the doctrine of *in pari delicto*. *See* REST. CONTRACTS §§ 599(a) and 600-603; see also 6A CORBIN ON CONTRACTS (1962) §1518, p. 744 ["A party who makes such a bargain in furtherance of his wrongful purpose cannot enforce it, even though it is enforceable against him by the other party if the latter is innocent of such a purpose."].

## VI. PLAINTIFF'S CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FRAUD IN THE INDUCEMENT

172. Gaia hereby restates and incorporates the allegations contained in Paragraphs 1 through 208 above as though set forth in full.

173. T1 Payments, LLC represented that T1 Payments, LLC was a Payment Facilitator, among the other representations described above. These statements appeared in T1 Payments LinkedIn page and on T1 Payments' website during the times the Plaintiff were unknowingly using Payvision'

services. *See* Exhibit 5; *see also* Footnotes 9 & 10, which are incorporated herein by this reference as though set forth in full.

174. T1 Payments published various advertisements regarding T1 Payments, LLC's status as one of the longest-standing kratom solutions offering lawful and reliable global payment processing services to online marketers of kratom.

175. T1 Payments published various articles on its website that included promises that T1 Payments, LLC was a payment facilitator that had direct relationships with card brands and acquirers that would enable T1 Payments to be a one stop shop for all merchant credit card transactions and related services. Exhibit 15. The contract also included the same misrepresentations.

176. T1promised Gaia during two meetings that his company was a fully registered Payment Facilitator and that it had direct contracts with registered payment service providers. He also promised T1 Payments would process Gaia's payments pursuant to all laws, card rules, policies and regulations.

177. T1 Payments was not in fact a registered PayFac or MSB, nor was it in privity with a registered payment service provider, nor was operating pursuant to law or pursuant to the Card Rules. T1 Payments illegally aggregated transactions from multiple merchants and to send those bundled transactions through T1's network of companies as described in the chart above, with the assistance of King, Fairchild, Dawson, Kamaly, and Pereira, depending on whether the transaction was running through a T-Company or a Pixxles Company, or one of the companies King and Fairchild formed together. It is important to note that T1's agent, Kasdon denied Scott Dawson had anything to do with T1 Payments, LLC during his September 2021 deposition in an earlier case, but Scott Dawson appeared on the T1 Payments, LLC American Express statements for T1 Payments, LLC, and then also as a director for Pixxles, LTD. T1was also aggregating the U.S. sub-merchants transactions in the U.K. entities formed and operated by Fairchild at T1's direction, and then into Payvision, B.V.'s

payment system. Payvision, B.V. had already been operating in this manner for years with Kasdon and his entities before the Plaintiff were sent through these alter ego sham companies and eventually ripped off. T1directed funds from this theft into the aptly named TGlobal Capital, LTD.

178. Payvision, B.V. was also in a civil conspiracy to gain access to U.S. sub-merchants like the Plaintiff' funds through T1 Payments' network of shell companies, re-route most of their funds into Payvision's bank account, distribute some amount into T1's or TGlobal Services, LLC's Nevada bank accounts.

179. Gaia reasonably relied on the representations made by T1 Payments, LLC in deciding to do business with T1 Payments, including contracting with T1 Payments for a merchant account, modifying the Gaia websites pursuant to T1 Payments' instructions, accepting ownership of a United Kingdom company, and submitting transactions to T1 Payments for processing pursuant to the Processing Agreement.

180. These representations were false, and T1 Payments and its representatives made these representations knowing they were false. In fact, T1 Payments' ability to offer the subject processing services to Gaia depended on T1 Payments' fraudulent scheme and illegal acts.

181. These representations were part of a fraudulent scheme orchestrated by T1 as well as T1's agent, Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira pursuant to their conspiracy with each other, to deceive Gaia regarding the subject processing services in order to fraudulently induce Gaia's reliance on these representations and to fraudulently induce Gaia into doing business with T1 Payments, and to fraudulently induce Gaia into submitting its transactions to T1 Payments for processing so that T1 could gain control over the proceeds of those transactions and convert them to its and its members and operations manager's own benefit rather than paying those funds to Gaia, notwithstanding Gaia's entitlement to and rightful ownership of those funds.

182. Each of the T Companies (T1 Payments, LLC, T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, LTD (Isle of Man); TGlobal Services, LTD (UK-1), and TGlobal Services, LTD (UK-1),) were part of the conspiracy by holding and transferring funds between T1 Payments, LLC and Payvision, and assisting T1 in concealing transfers from the U.S to the U.K. and holding stolen funds.

183. Each of the Pixxles Companies, Fairchild, Dawson, Kamaly, and Pereira were part of the conspiracy by becoming the "denouement" of the actions taken and directed by T1Each of the Pixxles companies and their managers took part in receiving the funds wrongfully transferred out of the T1 and the conspiring T-Companies between March 2021 and the present time. Each of them were in agreement to use those stolen funds, including the funds stolen from the Plaintiff, to create a new business outside of Nevada and outside of the United States, for the purpose of keeping judgment creditors and Plaintiff from collecting the funds due to them in Nevada.

184. King, Fairchild, Dawson, Kamaly, and Pereira were a part of this conspiracy as voluntary strawmen for T1. Notably, neither Fairchild nor King knew *anything* about the companies they purported to manage in their depositions. Both admitted in their depositions in an earlier lawsuit that they agreed to assist T1's agent, Kasdon in whatever way he needed, which was to accomplish this scheme for T1.

185. Actum Processing, LLC was part of the conspiracy in that it knowingly helped T1 Payments, LLC to appear to be processing payments in the U.S. by breaking up the bundled wire transfers of $2,500,000.00 that were sent to Actum from the T-Companies several times a week and paying expected amounts to the merchants.

186. Each of the managers of the Pixxles companies in the UK were knowingly in conspiracy by allowing their UK companies to be used to keep U.S. judgment creditors and U.S. Plaintiff from collecting the funds due to them in Nevada.

187. T1 Payments, LLC used all the conspirators to appear to be a real credit card payment company. All of the T Companies and Pixxles companies were used by T1 as a "shell game" to move and hide stolen money. Each of the conspirators knew and understood and agreed to assist T1's goal of inducing merchants into contracts with a fake credit card company. Each of the Defendants knew and understood and agreed to assist Kasdon's goal of transferring, accepting and hiding the stolen funds in UK companies.

188. Gaia has suffered in excess of $353,413.87 in damages as a direct and proximate result of Defendant's fraudulent conspiracy.

189. Gaia's reasonable reliance on T1 Payments' false representations was a substantial factor in Gaia's harm because, but for those representations and the trust Gaia reposed in the T1 Payments' representatives and sister companies, Gaia would never have done business with nor submitted its transactions to T1 Payments for processing, and T1 would have never gained control over Gaia's funds.

190. Defendant's wrongful acts as described herein were intentional, malicious, oppressive and fraudulent, and were committed with reckless disregard of harm to Gaia, in willful and conscious disregard of Gaia's rights, such that Gaia is entitled to recover punitive and exemplary damages against Defendant in an amount that is sufficient and appropriate to punish Defendant, as well as to deter them from committing similar acts in the future.

**SECOND CAUSE OF ACTION**
**FRAUD BY OMMISSION**

191. Plaintiff hereby restates and incorporates the allegations contained in Paragraphs 1 through 226 above as though set forth in full.

192. T1 knew that it was not able to handle merchant funds under the Card rules and under federal law, but it promised it would anyway. T1 also knew Payvision notified TGlobal Services, LTD of the termination of T1's scheme on or after March 16, 2021, since December 16, 2020, but omitted

and concealed that information from the Plaintiff (and all of the other merchants that signed up for T1 Payments' "service") to induce them to continue to taking customer transactions through their websites that included new foreign company information. T1 Payments induced the Plaintiff to continue taking transactions so that the Plaintiff would grow the amount of money held by the T-Companies (T1 Payments, LLC, T1 Payments, LTD, TGlobal Services, LLC, TGlobal Services, LTD; and TGlobal Capital LTD) before Payvision cut-off the ability to take any more transactions. Further, T1 Payments, LLC proceeded to notify the Plaintiff that their transaction limit was raised, after it became aware of the pending shutdown, to accumulate even more funds. T1 Payments concealed its true situation in order to amass as much money as possible before transferring the money (and new clients) over to the Pixxles brand through one of its agents or shell companies, on May 28, 2021, without warning.

193. Defendant failed to disclose these material facts and circumstances which they were under an obligation to disclose because of the duty of good faith and fair dealing, under the terms of the contract, under the NDTPA, and because they utilized the concealment to further the already-fraudulent scheme the Plaintiff were trapped in.

194. Defendant knowingly and with the intent to defraud, engaged in these acts above, in the course of business, employing a scheme which operated as a fraud or deceit upon Gaia and its subsidiary Mitragaia, LTD, by means of the omission of a material fact that T1knew to be omitted. T1 intended the Plaintiff to rely on itsprevious understanding of the scheme by omitting the new information, which resulted in the Plaintiff increased transactions and amount of money under T1's control, and then to a complete loss of those funds by the Plaintiff who relied on the previous understanding of the scheme, before the omission. Plaintiff relied on them because there was no public information to the contrary, and the letters were private correspondence between Payvision and T1Plaintiff also still believed that T1 Payments, LLC was a legitimate credit card processor.

195. The Plaintiff did not become aware of the fraudulent concealment of the notifications from Payvision of the shutdown of T1's scheme until T1 Payments, LLC provided those letters to the bankruptcy trustee on November 20, 2023.

196. Gaia has suffered in excess of $353,413.87 in damages as a direct and proximate result of Defendant's fraud.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE NEVADA**
**DECEPTIVE TRADE PRACTICES ACT**

197. Plaintiff hereby restate and incorporates the allegations contained in Paragraphs 1 through 237 above as though set forth in full.

198. By these actions and omission described hereinabove, T1violated the Nevada Deceptive Trade Practices Act (NDTPA).

199. Defendant engaged in a "deceptive trade practice" when in the course of their business scheme they knowingly: (i) passed off services for sale as those of another person; (ii) made a false representation as to the source, sponsorship, approval or certification of services for sale; (iii) made a false representation as to affiliation, connection, association with or certification by another person; (iv) used deceptive representations or designations of geographic origin in connection with services for sale; (v) made a false representation as to the characteristics of services for sale, and a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith; (vi) advertised services with intent not to sell as advertised; (vii) advertised services for sale with intent not to supply reasonably expectable demand; (viii) conducted their business scheme without all required state, county or city licenses; (ix) made false representations in a transaction; (x) failed to disclose a material fact in connection with the sale of services. See NRS 598.0915.

200. T1misrepresented its history and omitted telling Gaia about the numerous complaints, lawsuits, and allegations made against them for the sale of the same or substantially similar "credit

card services." T1 also failed to tell the Plaintiff the truth about how it would get the Plaintiff's credit cards processed after it told him it would do all of the processing through its own acquiring bank.

201. Defendant's inability to perform their promised obligation, to either Gaia or other merchants, clearly indicates their false representations regarding the underlying transaction, i.e., the failure to disclose that Gaia would not receive the service as promised.

202. The actions and omissions of the Defendant described herein proximately caused damages to the Plaintiff in the amount of $353,413.87.

## FOURTH CAUSE OF ACTION
## CONVERSION

203. Gaia hereby restates and incorporates the allegations contained in paragraphs 1 through 243 above as though set forth in full.

204. Gaia owns and has a right to immediate access and control of no less than $333,718.18 in funds being held by the Defendant.

205. Defendant intentionally and substantially interfered with Gaia's right to possession by taking possession of these funds through agreement in the network of companies and individuals complained of, preventing Gaia from having access to these funds, and refusing to return these funds to Gaia after it demanded their return.

206. Gaia did not consent to Defendant's conduct.

207. Gaia suffered harm in the amount of no less than $333,718.18 by being deprived of possession of these funds.

208. Defendant's conduct was a substantial factor in causing Gaia's harm as described above.

209. Defendant's wrongful acts as described herein were intentional, malicious, oppressive, and fraudulent, and were committed with reckless disregard of harm to Gaia, in willful and conscious disregard of Gaia's rights, such that Gaia is entitled to recover punitive and exemplary damages

against Defendant in an amount that is sufficient and appropriate to punish Defendant, as well as to deter them from committing similar acts in the future.

**FIFTH CAUSE OF ACTION**
**THEFT**

210. Gaia hereby restates and incorporates the allegations contained in paragraphs 1 through 250 above as though set forth in full.

211. Defendant conspired to engage in acts of theft as described above with respect to Plaintiff's property by allowing T1to control and keep no less than $353,413.67 in funds belonging to Gaia with the intent to deprive Gaia of those funds; converting no less than $353,413.67 in funds belonging to Gaia and entrusted to T1 Payments, LLC for the limited purpose of processing and settling Gaia's customer card payment transactions; obtaining no less than $353,413.67 in funds belonging to Gaia by a material misrepresentation with the intent to deprive Gaia of those funds. Such misrepresentations include the fraudulent misrepresentations described above, and the false pretense that T1 Payments was increasing Gaia's monthly processing volume to ensure that Gaia could keep processing without interruption when in fact the increase was merely a device to get Gaia to process more transactions so T1could gain control over more funds before this scheme was shut down.

212. By this conduct, Defendant has committed an offense involving stolen property within the meaning of section 1 of NRS 205.275 by receiving, possessing and withholding no less than $353,413.67 in funds belonging to Gaia for Defendant's own benefit and to prevent Gaia from possessing those funds, knowing those funds constitute stolen property and under such circumstances as should have caused a reasonable person to know that those funds constitute stolen property.

**SIXTH CAUSE OF ACTION**
**BREACH OF CONTRACT**

213. Gaia hereby restates and incorporates the allegations contained in paragraphs 1 through 259 above as though set forth in full.

214. Alternatively, and without waiving the foregoing, Gaia entered into a Processing Agreement with T1 Payments on or about August 12, 2020.

215. Gaia performed all conditions, terms, covenants, and agreements to be performed by Gaia thereunder. To the extent that Gaia owed any other obligation to T1 Payments under the Processing Agreement, Gaia's performance of any other such condition, term, covenant, or agreement has been excused, waived, or rendered impossible by T1 Payments.

216. T1 Payments has materially breached the terms of the Agreement by violating Section 4.1 and failing to process Gaia's payment transactions pursuant to the terms of this Agreement, the Payment Brand Rules, program rules and policies of its third party processors, and all applicable laws and regulations. T1 Payments, LLC simply never processed the Plaintiff' transactions.

217. T1 Payments has materially breached the terms of the Agreement by violating Section 6.2. Specifically, Tl Payments failed to deliver payment of amounts owing to Gaia as promptly as is practicable after processing.

218. T1 Payments also breached the Agreement's Section 8.1 through 8.4 by withholding Gaia's settled funds in addition to the Reserve Account funds described therein. T1 Payments, LLC failed to trigger any of these reserve account increases because it failed to send the required notices of the same pursuant to the notice section of the Agreement.

219. T1 Payments also breached the Agreement by withholding funds under illegal and unenforceable provisions in the contract, including those in 8.1-8.4; and 6.8.

*Alter-Ego Allegations*

220. At all times complained of the T-Companies and the Pixxles Companies were all the alter egos of T1: (i) the T-Companies and Pixxles Companies were always solely influenced and governed by T1 Payments, using its straw men Kasdon, King, Fairchild, Pereira, Dawson, and Kamaly; (ii) there was such unity of interest and ownership that the T-Companies, Pixxles Companies and T1were

inseparable from the other, which became apparent when T1's agent, Kasdon continued to use the T-Companies as his concealed "card servicer" even after both he and T1 Payments, LLC lost their ability to merchant money at the same time, and when T1's agent, Kasdon was the sole boss of Pixxles Companies—even though he was not listed as a director of any of them; and (iii) the facts are such that adherence to the corporate fiction of T-Companies and Pixxles Companies as separate entities would, under the circumstances, sanction fraud or promote injustice. Indeed, T1's agent, Kasdon began using a Pixxles.com email address in 2019, before anyone else, years before any of the Pixxles Companies were in business.

221. Further evidence of a unity of interest existing between T1's agent, Kasdon and the T-Companies exists because: (i) T1's agent, Kasdon and the T-Companies relied on one tax return each year; (ii) they co-mingled funds since T1's agent, Kasdon did not have his own bank account; (iii) the T-Companies were undercapitalized when it notified the Plaintiff they would not be getting their funds back; (iv) T1's agent, Kasdon diverted the T-Companies funds for his own use and treated the corporate assets as his own; and (v) T1's agent, Kasdon failed to observe corporate formalities by failing to keep yearly corporate formalities between the T Companies. T1's agent, Kasdon used the bank accounts of the T-Companies interchangeably, moving funds between them for expenses that were shared between them. In fact, T1's agent, Kasdon shared an office and assets and debts with all of the T-Companies.

222. T1's agent, Kasdon's control over the Pixxles Companies, at T1's behest is clear from his girlfriend Fairchild's total lack of knowledge about anything Pixxles does for business—even though she is supposedly the director of the companies.

223. As a direct and proximate result of T1 Payments' breach of its contractual obligations to Gaia, Gaia has suffered in excess of at least $353,413.67 in damages in an amount to be proven at trial. Such damages are clearly ascertainable both in nature and in origin.

**SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

224. Gaia hereby restates and incorporates the allegations contained in paragraphs 1 through 269 above as though set forth in full.

225. Alternatively, and without waiving the foregoing, the Processing Agreement between T1 and its and Gaia contained an implied covenant of good faith and fair dealing.

226. This implied covenant of good faith and fair dealing required that T1 Payments act in good faith so as not to defeat the purpose, or deprive Gaia of the benefits, of the Processing Agreement. T1 Payments LLC performed in a manner that was unfaithful to the contract's purpose, Gaia's justified expectations were denied, and actual damages resulted.

227. T1 Payments breached the implied contractual covenant of good faith and fair dealing by doing the acts alleged herein, including but not limited to misreporting the amounts due and owing to Gaia, seizing Gaia's settled funds and Reserve Account funds without having triggered the contractual right to do so, or having relied on illegal and unenforceable provisions that render the Agreement illusory, and continuing to withhold a significant amount of Gaia's funds after it blamed the termination on Payvision—while the contract requires one of the parties to terminate the contract before total withholding is triggered.

228. As a direct and proximate cause of T1 Payments' breach of the implied covenant of good faith and fair dealing, Gaia has suffered in excess of $353,413.67 in damages in an amount to be proven at trial. Such damages are clearly ascertainable both in nature and in origin.

**EIGHTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**

229. Gaia hereby restates and incorporates the allegations contained in paragraphs 1 through 274 above as though set forth in full.

230. Alternatively, because Gaia alleges fraudulent inducement in the Agreement, Gaia alleges it conferred benefits to T1 Payments, its alter ego T-Companies, King and Fairchild, and the Pixxles Companies in the amount of at least $353,413.67 in the form of cash and Defendant appreciated and retained those benefits. These funds were withheld from Gaia ultimately at the direction of T1, using the network of individuals described above.

231. T1 Payments accepted and continue to retain the benefits from Gaia's customers (i.e., payments made for kratom products shipped and marketed by Gaia) in his new ventures, that were intended for Gaia, and failed to pay Gaia, such that under the circumstances it would be inequitable for Defendant to retain the benefit without payment of the value thereof.

232. As a direct and proximate result of it being unjustly enriched, Defendant has caused Gaia to suffer damages exceeding $353,413.67 to be proven at trial.

233. Gaia should be awarded its reasonable attorneys' fees and costs incurred in bringing this action.

**NINTH CAUSE OF ACTION**
**VIOLATION OF THE NEVADA CIVIL RICO STATUTE**

234. T1, Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira, in conspiracy with and using Kasdon's alter-ego T-Companies, and in conspiracy with and through the Pixxles' Companies, engaged in racketeering activities as defined in NRS 207.360 & 207.390 and a racketeering enterprise as is defined in NRS 207.380.

235. T1 Payments participated directly in racketeering activity by engaging in at least two crimes related to racketeering as discussed in Section IV(F)(ii) supra, including but not limited to: (i) obtaining possession of money or property valued at $650 or more, or obtaining a signature by means of false pretenses; (ii) embezzlement of money or property valued at $650 or more; (iii) fraudulent conduct under NRS 91.230; and (iv) multiple transactions involving fraud or deceit in course of enterprise or occupation under NRS 205.377.

236. The enterprise is the union, association and other group of persons associated in fact although not a legal entity described in the chart on page 23 supra, led by T1, along with the Pixxles Companies and their managers handpicked by T1.

237. T1's activities have the same or similar pattern, intent, results, accomplices, victims, and methods of commission, and are interrelated by distinguishing characteristics, and are not isolated events. The transactions that were handled by the T-Companies occurred hundreds of times a day. The transactions that benefited the Pixxles Companies and each Pixxles Company's hand-picked directors began occurring on December 7, 2017, and continued until the last dollar was transferred out of the T-Companies in January 2023 for the benefit of the Pixxles Companies.

238. T1formed and maintained directly or indirectly an interest in, or control of the T-Companies and the Pixxles Companies to conduct or participate directly or indirectly in the affairs of the overall T1's enterprise through their racketeering activities.

239. As set forth hereinabove, T1 hasmaintained these same racketeering activities since at least 2012 when T1's agent, Kasdon, at T1's behest, King, and Fairchild began using T1 Payments, LLC to masquerade as a payment processor for "high-risk" merchants. As the 2016 *Dermaktiv* complaint explains, (See Case 2:16-cv-00739:JAD-PAL in the U.S.D.C. Nevada), T1 Payments originally had access to sub-merchants' money by secretly using payment processing company "Atlantic-Pacific Processing Systems," beginning in 2012.

240. T1, T1's agent, Kasdon, Fairchild and King never disclosed they were middlemen, instead misleading sub-merchants into believing they were operating a licensed, legitimate payment processing company. Once T1 had the merchants' money, it stole millions of dollars by utilizing dubious clauses in the merchants' fraudulently induced contracts. In the process, T1 used the money they stole from the unsuspecting merchants as leverage for settlements at a fraction of the amount stolen.

241. Later, T1did the exact same thing using "Merrick Bank," "Synovis Bank", and then "Vantiv."

242. T1added Dawson, Kamaly, and Pereira to the enterprise in 2017 and continued masquerading the T-Companies as legitimate payment processors under the T1 Payments, LLC name for years as set forth in these following cases while transferring stolen money to the Pixxles Companies through T1's intermediaries: (i) *Onyx & Rose LLC v. T1 Payments LLC*, United States District Court for the District of Nevada, Case No. 2:20-cv-00008-KJD-NJK, filed July 3, 2019; (ii) *PureKana LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:19-cv-01399-KJD-NJK, filed August 14, 2019; (iii) *T1 Payments LLC v. New U Life Corp.*, United States District Court District of Nevada, Case No. 2:19-cv-01816-APG-DJA, filed October 17, 2019; (iv) *T1 Payments, LLC v. Hannavas Enterprises, LLC*, United States District Court for the District of Nevada, Case No. 2:2020-cv-00411, filed February 27, 2020; (v) *First Capital Venture Co. v. T1 Payments, LLC*, Eighth Judicial District, Clark County Nevada, Case No. A-21-834626-B, filed May 14, 2021; (vi) *Vida Davina, LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:2021-cv-01005, filed May 26, 2021; and (vii) *Ibuumerang, LLC v. T1 Payments LLC, United* States District Court for the District of Nevada, Case No. 2:21-cv-01611-JCM-VCF, filed August 31, 2021; and (viii) *Gaia Ethnobotanical, LLC v. T1 Payments, LLC*, United States District Court for the District of Nevada, Case No. 2:22-cv-01046, filed May 18, 2022.

243. T1 "terminated" several large T-Company sub-merchants' accounts each year, keeping millions of dollars for himself and his new venture Pixxles in the UK. King, Fairchild, Dawson, Kamaly, and Pereira all assisted Kasdon in transferring wealth out of the U.S. merchants and into the new UK venture, away from the Plaintiff and judgment creditors in Nevada.

244. T1, Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira acquired or maintained directly or indirectly an interest in each of the T-Companies and Pixxles Companies. Kasdon, King, Fairchild,

Dawson, Kamaly, and Pereira are also employed by the enterprise to conduct or participate directly or indirectly in the affairs of the enterprise through the racketeering activity described above.

245. Since 2014, there have been numerous lawsuits filed against these defendant, but it is only becoming clear now how they structured their fraud through all these entities and countries.

246. The Plaintiff' injuries flow from Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira conspired to violate the a predicate Nevada RICO acts listed above, and jointly followed through with the conspiracy. The Plaintiff's injury was proximately caused by Kasdon, King, Fairchild, Dawson, Kamaly, and Pereira's violations of the predicate acts in the amount of $353,413.87.

247. At no point did the Plaintiff participate in the commission of these predicate acts.

248. The Plaintiff is also entitled to institute a civil action for recovery of treble damages proximately caused by the RICO violations.

**TENTH CAUSE OF ACTION**
**DECLARATORY RELIEF**

249. Gaia hereby restates and incorporates the allegations contained in paragraphs 1 through 276 above as though set forth in full.

250. Gaia seeks a declaration from this Court that the Contract between the Plaintiff and T1 Payments, LLC is void as illegal.

251. Gaia also seeks a declaration from this Court that the contract in issue was fraudulently induced.

252. Gaia seeks a declaration from this Court that T1 Payments, LLC did not terminate the contract in issue in this case pursuant to the terms of the contract.

253. Gaia seeks a declaration from this Court that T1 Payments, LLC was not allowed to withhold any funds from the Plaintiff.

254. Gaia also seeks a declaration that the provisions in section 8 of the Agreement that allow for T1 to hold funds as reserves in perpetuity have not been triggered in this case.

255. Gaia also seeks a declaration that the reserve amount or percentage was never increased pursuant to section 8 of the Agreement.

256. Gaia also seeks a declaration that T1 Payments did not terminate the contract in issue by way of the May 28, 2021 email to the shareholder of the Plaintiff.

257. Gaia also seeks a judicial declaration that all of the provisions purporting to allow T1 Payments unilateral rights to change or limit or terminate the contract without cause are severed out of the contract pursuant to the severability clause at §28 as <u>unenforceable provisions</u>.

258. An actual controversy has arisen and now exists between Gaia and the Defendant concerning their respective rights and duties as set forth above, whereas Defendant disputes these contentions and contends that they did nothing wrong.

259. Gaia desires a judicial determination of the parties' rights and duties, and a declaration as to the above.

260. A judicial declaration is necessary and appropriate at this time under the circumstances in order hat Gaia may avoid any further financial burden in connection with these matters by an improper attempt by Defendant to withhold and keep Gaia’s money.

## <u>VII. TOLLING</u>

261. Plaintiff pleads the Discovery Rule and Fraudulent Concealment with respect to each of the claims above, which starts the statute of limitations when the Plaintiff discover, or reasonably should have discovered, the material facts for the action. Plaintiff could not have discovered all of the facts and parties regarding the conspiracy above, becauseT1 Payments’ *entire scheme relied on the fraudulent concealment of the actual names of the companies, correspondence between those companies, and persons Defendant used in furtherance of their fraud as described hereinabove*.

262. Plaintiff also could not have pieced together the network of companies exchanging funds without the bank account statements, which were not produced until after Chase Bank and Wells Fargo records were produced in the T1 Payments, LLC's bankruptcy on November 20, 2023. Nor could the Plaintiff have known about the communications between T1 Payments and Payvision until those letters were produced in the bankruptcy on November 20, 2023.

263. Moreover, Defendanthas completely refused to engage in any discovery in this case, including responding to requests for production or sitting for their properly noticed and scheduled depositions, which resulted in the lack of information Plaintiff could utilize in this case before the deadline to amend pleadings on March 20, 2024.

## PRAYER

WHEREFORE, Plaintiff respectfully pray that they receive judgment of this Court against the Defendant as follows:

1. For general and economic damages according to proof;

2. For special damages according to proof;

3. For exemplary and punitive damages according to proof and in an amount sufficient to punish and set an example of Defendant;

4. For imposition of a constructive trust over funds belonging to Plaintiff but retained by Defendant;

5. For treble damages against Defendant in an amount according to proof;

6. For all declaratory relief as requested hereinabove;

7. For all statutory and civil penalties permitted under law;

8. For all attorneys' fees and costs according to proof;

9. For prejudgment and post-judgment interest against Defendant; and

10. For any such other and further relief, whether at law or equity, to which it is justly entitled and/or the Court deems appropriate.

## I. CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss and for any such other and further relief, whether at law or equity, to which it is justly entitled and/or the Court deems appropriate.

Dated: August 6, 2025

Respectfully submitted,

MINCIN LAW, PLLC

By: /s/ David Mincin____________

David Mincin, Esq.
Nevada State Bar No. 5427
7465 W. Lake Mead Boulevard, #100
Las Vegas, Nevada 89128

By:_/s/ Adam Allen_______________

Adam Allen, Esq.
ALLEN & ASSOCIATES
2777 Allen Parkway, Suite 1000
Houston, Texas 77019
Phone: 832-871-5920
Fax: 281-503-7671
adam@aallenlaw.com
*Pro Hac Vice*

## CERTIFICATE OF SERVICE VIA EFILE

Pursuant to LR 5-1, I hereby certify that I am an employee of Allen & Associates, and I hereby certify that I electronically filed the foregoing Gaia's Third Amended Complaint with the clerk of the court for the United States District Court for Nevada by using the Court's CM/ECF system and on all appearing parties this 6th day of August 2025:

By:____*/s/ Adam Allen*____________________

Adam Allen, Esq.